WILLIAM A. MOLINSKI (SBN 145186)
wmolinski@orrick.com
DAVID P. FUAD (SBN 265193)
dfuad@orrick.com
EMILY RAE (SBN 308010)
emily.rae@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
Telephone:   (213) 629-2020
Facsimile:    (213) 612-2499

*Attorneys for Plaintiff*
TONGFANG GLOBAL LIMITED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TONGFANG GLOBAL LIMITED, a Hong Kong corporation,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>ELEMENT TELEVISION COMPANY, LLC, a Delaware limited liability company, and ELEMENT TV COMPANY, LP, a Delaware limited partnership,<br><br>　　　　　Defendant(s). | Case No. 2:20-cv-00876_____<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT;**<br><br>2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ALTERNATIVE CLAIM); and**<br><br>3. **QUASI CONTRACT: RESTITUTION/UNJUST ENRICHMENT (ALTERNATIVE CLAIM)** |

1    Plaintiff Tongfang Global Limited ("Tongfang"), by and through its

2   attorneys, files this Complaint against defendants Element Television Company,

3   LLC ("Element LLC") and Element TV Company, LP ("Element LP")

4   (collectively, "Element" or "Defendants"), and alleges as follows:

5                          **INTRODUCTION**

6      1.    This case arises from a shortfall of at least $87 million worth of goods

7   that Plaintiff Tongfang shipped to Defendants pursuant to purchase orders

8   Defendants issued over the years.

9      2.    Tongfang is an ODM (Original Design Manufacturer) company. It

10  manufactures or directs the manufacturing in China of televisions, partially-

11  assembled television sets, or television components (collectively "TV Products").

12  The TV Products are imported into the United States and eventually sold under third-

13  party brands.

14     3.    Defendants market and sell "Element"-brand televisions to retailers and

15  other customers in the United States.

16     4.    Pursuant to the parties' Supply Agreement described below, Defendants

17  issued purchase orders to Tongfang to buy its TV Products for assembly into

18  completely-built television units at Defendants' factory in South Carolina. Tongfang

19  performed its obligations under the parties' agreement by supplying the TV Products.

20  Tongfang is entitled to payment from Element for each purchase order that it fulfilled.

21                          **THE PARTIES**

22     5.    Plaintiff Tongfang Global Limited is a corporation existing under the

23  laws of Hong Kong with its principal place of business in Shenzhen, China.

24     6.    Defendant Element Television Company, LLC is a limited liability

25  company that is organized under the laws of Delaware with its principal place of

26  business in Winnsboro, South Carolina. Tongfang alleges under Rule 11(b)(3) that

27  Michael O'Shaughnessy, a resident of Minnesota, is the managing member of

28  Element LLC.

7.     Defendant Element TV Company, LP is a limited partnership that is organized under the laws of Delaware. Tongfang alleges under Rule 11(b)(3) that Element LLC is the general partner of Element LP.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action based on diversity of citizenship under 28 U.S.C. section 1332(a), as the amount in controversy exceeds $75,000 and the dispute is between a Hong Kong corporation and citizens of the United States.

9.     This Court has personal jurisdiction over Defendants pursuant to the terms of the parties' February 12, 2014 Supply Agreement ("Supply Agreement"), which provides that the parties agree to submit to the jurisdiction of "either the jurisdiction of the courts of the Hong Kong Special Administrative Region of the People's Republic of China or in any state in the United States of America, with the choice of such venue made by the Plaintiff." *See* Ex. 1 (Supply Agreement) at 15. This Court also has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting activities in California and the benefits of California law by purposefully transacting business in both the State of California and this District specifically.

10.     Venue is proper pursuant to 28 U.S.C. section 1391(b)(3) because Defendants are subject to the Court's personal jurisdiction, as alleged above.  Further, venue is proper because (a) one of Tongfang's subsidiaries to whom Defendants issued several of the purchase orders at issue is located in this District; and (b) the parties have conducted negotiations relating to the Supply Agreement (including negotiations addressing the issues alleged in this Complaint) in this District.

## FACTUAL BACKGROUND

11.     This breach of contract action arises out of Defendants' failure to pay Tongfang in accordance with the parties' Supply Agreement.

COMPLAINT

12.    Tongfang is a China-based consumer electronics company.  Tongfang has been supplying television products to the United States market and globally for more than a decade. Tongfang does not own a television brand in the U.S. Its television products instead have been sold in the U.S. market under brands such as Westinghouse, Element, and other Japanese and global TV brands.

13.    Tongfang formed a business relationship with Mr. Michael O'Shaughnessy as early as 2011 to supply the U.S. market with television sets under the Element brand. Mr. O'Shaughnessy was formally retained by Tongfang's California subsidiary as a sales representative on or about August 2012.

14.    Tongfang alleges under Rule 11(b)(3) that Mr.  O'Shaughnessy has at all times exercised ownership or control of the Element brand.

15.    On or about late 2013 and early 2014, Tongfang executives and Mr. O'Shaughnessy entered into discussions for a new business model for marketing and selling Element-branded televisions in the U.S.  These discussions resulted in the execution of a February 12, 2014 Supply Agreement between Plaintiff Tongfang Global Ltd., on the one hand, and Defendants Element Television Company, LLC and Element TV Company, LP, on the other hand.  Mr. O'Shaughnessy also contemporaneously executed a Conditional Springing Personal Guaranty.

16.    After the execution of the Supply Agreement, Tongfang would manufacture, or have manufactured, TV Products, including partially-assembled television sets (known as "Semi-Knocked Down" or "SKD" products) and ship them to Defendants in the United States.

17.    Defendants would take the partially-assembled SKD products, perform the final assembly to create ready-for-market television sets ("Complete Build Units" or "CBUs") at their manufacturing plant in Winnsboro, South Carolina, and sell the televisions under the "Element" brand to retailers, including Walmart, Meijer, Costco, and others.

COMPLAINT

18.    The Supply Agreement provides that Defendants "shall purchase the Product from [Tongfang] at the Purchase Price."  *See* Ex. 1 (Supply Agreement) at 4.  "Purchase Price" is defined as "the actual bill of material ('BOM') cost as negotiated on a case-by-case basis and as set forth in each applicable . . . written purchase order delivered by [Defendants] to [Tongfang] pursuant to this Agreement."  *Id.* at 2.

19.    The Supply Agreement also provides for a payment system in which retailers' payments for the televisions would be deposited into an escrow account or accounts for the parties' benefit.  Under the Supply Agreement, (1) Element submits a purchase order for SKD products that Tongfang fulfills; (2) Element assembles the SKD products into ready-for-market televisions in South Carolina and sells the resulting CBUs to retailers around the country; (3) Element's retailer-customers deposit the proceeds of those sales into an escrow account; and (4) Tongfang and Element jointly direct the escrow agent to disburse the funds to Tongfang and Element.

20.    In addition, pursuant to the Supply Agreement, Tongfang extended to Element "open account" payment terms. Element's obligation to pay Tongfang, however, "shall become immediately due and payable" when Element receives payment from its retailer-customers.  Tongfang alleges under Rule 11(b)(3) that Defendants sold the televisions they assembled using the TV Products they purchased from Tongfang to customers and received payment.

21.    The deposits into the escrow accounts have not included many amounts that Tongfang is owed under the Supply Agreement.  These amounts include, but are not limited to:

   a.  Televisions returned by Walmart customers, including televisions that were not defective (*e.g.*, due to buyer's remorse).  Walmart would return the units to Element and deduct the corresponding sales revenue from the then-current invoice amounts that Walmart owed to Element and that

would otherwise be deposited into the designated escrow account. Element would refurbish and re-sell these returned televisions without paying Tongfang.

    b.  Televisions sold to certain non-Walmart retailers, including Meijer, Costco, and others, for which the retailer-customer did not deposit all proceeds of the sale, or any proceeds at all, into an escrow account, and for which Element did not otherwise pay Tongfang.

    c.  Inventory accumulating at Element's South Carolina factory since January 2019 or even earlier for which Tongfang has not received payment.

    d.  Inventory for which Element did not pay the full purchase order amount.

22.    Defendants have materially breached the Supply Agreement by failing to pay Tongfang the purchase price stated on Element's purchase orders for these products. According to Tongfang's records, the disparity between the purchase orders issued by Element and the funds received by Tongfang is at least $87 million.

23.    Tongfang is entitled to compensatory damages comprised of the unpaid balance of the amount stated on Element's purchase orders.

## FIRST CAUSE OF ACTION

### (Breach of Contract against Element LLC and Element LP)

24.    Tongfang re-alleges and incorporates the allegations set forth in Paragraphs 1-23 above as if fully set forth herein.

25.    The parties' February 12, 2014 Supply Agreement is a binding and enforceable contract.

26.    The Supply Agreement provides that Defendants "shall purchase the Product from [Tongfang] at the Purchase Price." *See* Ex. 1 (Supply Agreement) at 4. "Purchase Price" is defined as "the actual bill of material ('BOM') cost as negotiated on a case-by-case basis and as set forth in each applicable . . . written

         COMPLAINT

1  purchase order delivered by [Defendants] to [Tongfang] pursuant to this Agreement."
2  *Id.* at 2.

3      27.   The Supply Agreement further provides that Defendants "agree[] that
4  all proceeds resulting from the sale of Products or CBUs assembled from Products
5  shall be deposited into Escrow, and [Defendants] agree[] to pay or cause to be paid
6  any and all amounts due to [Plaintiff] hereunder."  *Id.* at 5.

7      28.   Defendants issued purchase orders for TV Products to Tongfang, which
8  Tongfang fulfilled.  Tongfang alleges under Rule 11(b)(3) that Defendants assembled
9  and/or sold the resulting televisions to customers and received payment.  Defendants
10 materially breached the Supply Agreement by failing to pay Tongfang the full
11 amount stated on Defendants' purchase orders that Tongfang fulfilled.

12     29.   Tongfang has performed all of its obligations under the contract, except
13 to the extent that its obligations have been excused by Defendants' conduct as alleged
14 herein.

15     30.   As a direct and proximate cause of Defendants' material breaches of the
16 parties' Supply Agreement, Tongfang has been damaged in an amount to be proven
17 at trial, but at least $87 million, exclusive of interest.

18                    **SECOND CAUSE OF ACTION**
19  **(Breach of Implied Covenant of Good Faith and Fair Dealing against Element**
20      **LLC and Element LP, Plead in the Alternative to Tongfang's Breach of**
21                          **Contract Claim)**

22     31.   Tongfang re-alleges and incorporates the allegations set forth in
23 Paragraphs 1-30 above as if fully set forth herein.

24     32.   In the alternative, Tongfang alleges that Defendants breached the
25 Supply Agreement's implied covenant of good faith and fair dealing by failing to pay
26 Tongfang for TV Products that Defendants purchased, received, assembled into
27 televisions, and/or sold to retailers and customers. Should it be determined

28

COMPLAINT

1  Defendants did not breach the express provisions of the Supply Agreement,
2  Tongfang alleges as follows:

3       33.    The parties' February 12, 2014 Supply Agreement is a binding and
4  enforceable contract.

5       34.    The Supply Agreement includes an implied covenant, actionable in
6  contract, that Defendants will act in good faith and deal fairly with Tongfang.

7       35.    Defendants issued purchase orders for TV Products to Tongfang, which
8  Tongfang fulfilled.  Tongfang alleges under Rule 11(b)(3) that Defendants assembled
9  and/or sold the resulting televisions to customers and received payment.  Defendants
10 breached the Supply Agreement's implied covenant of good faith and fair dealing by
11 failing to pay Tongfang the full amount stated on Defendants' purchase orders that
12 Tongfang fulfilled.

13      36.    Tongfang has performed all of its obligations under the contract, except
14 to the extent that its obligations have been excused by Defendants' conduct as alleged
15 herein.

16      37.    Defendants' breaches were conscious, deliberate, and unreasonable
17 acts, which were designed to, and which did, unfairly frustrate the agreed common
18 purposes of the parties' Supply Agreement, and which disappointed Tongfang's
19 reasonable expectations by denying Tongfang the benefits of the contract.

20      38.    As a direct and proximate cause of Defendants' material breaches of the
21 parties' Supply Agreement, Tongfang has been damaged in an amount to be proven
22 at trial, but at least $87 million, exclusive of interest.

23                              **THIRD CAUSE OF ACTION**

24    **(Quasi Contract: Restitution/Unjust Enrichment against Element LLC and**
25    **Element LP, Plead in the Alternative to Tongfang's Breach of Contract and**
26    **Breach of the Implied Covenant of Good Faith and Fair Dealing Claims)**

27      39.    Tongfang re-alleges and incorporates the allegations set forth in
28 Paragraphs 1-38 above as if fully set forth herein.

COMPLAINT

40.     In the alternative, under the doctrine of quasi contract, or similar equitable doctrines, Tongfang is entitled to restitution by virtue of Defendants' unjust enrichment. Should it be determined that the Supply Agreement is not a valid, enforceable contract, Tongfang alleges as follows:

41.     The TV Products that Tongfang manufactured and shipped to Defendants constitute a benefit to Defendants.

42.     Defendants issued purchase orders for TV Products to Tongfang. Tongfang manufactured and shipped the TV Products at a cost to itself, and expected to be paid the amount stated on Element's purchase orders that Tongfang fulfilled.

43.     Tongfang alleges under Rule 11(b)(3) that Defendants assembled and/or sold the resulting televisions to customers and received payment, but failed to pay Tongfang for certain sales. Defendants have retained the proceeds of these sales.

44.     Defendants have been unjustly enriched in an amount to be proven at trial, but at least $87 million, exclusive of interest.

## PRAYER FOR RELIEF

WHEREFORE, Tongfang prays for relief and judgment as follows:

a)     On the First Cause of Action, for compensatory and/or consequential damages in an amount estimated to be at least $87 million, to be determined at trial;

b)     On the Second Cause of Action, for compensatory damages in an amount estimated to be at least $87 million, to be determined at trial;

c)     On the Third Cause of Action, for restitution in an amount estimated to be at least $87 million, to be determined at trial;

d)     For an award of pre-judgment and post-judgment interest; and

e)     For such other and further relief as the Court may deem proper.

COMPLAINT

1    Dated: January 28, 2020                      Respectfully submitted,

2                                                 WILLIAM A. MOLINSKI
3                                                 DAVID P. FUAD
                                                  EMILY RAE
4                                                 Orrick, Herrington & Sutcliffe LLP

5

6                                                 By: /s/William A. Molinski
7                                                     WILLIAM A. MOLINSKI
                                                     *Attorneys for Plaintiff Tongfang*
8                                                     *Global Limited*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT 1



*CONFIDENTIAL*

## Contract Cover Sheet -- (Supply Agreement)

**Parties Information:**

| | | | |
|---|---|---|---|
| Internal Party: Tongfang Global Ltd. (Supplier); | | | |
| External Party: | Element TV Company, LP; Element TV Company, LLC (Buyer) | Attention: | |
| Incorporated: | Delaware | Title: | |
| Address: | 10909 Valley View Rd | Telephone: | 612-669-7708 |
| | | Fax: | |
| City, State, Zip: | Eden Prairie, Minnesota 55344 | E-mail: | |
| | | Attention: | |
| | | Title: | |
| | | Telephone: | |
| | | Fax: | |
| | | E-mail: | |

**Summary of Key Terms:**

| | |
|---|---|
| Purpose | The purpose of this agreement is to supply Element with SKUs in order for them to assemble the parts in their U.S. factories. |
| Forecast | 12 months rolling forecast |
| Pricing | Set forth in Purchase Order |
| Shipment | FOB China |
| Effective Date | 2/12/2014 |
| Term | 1 year, with automatic renewal |
| Termination | 180 days prior written notice |
| Choice of Law | Delaware |
| Choice of Forum | Hong Kong or the US |

**Attachments:**

| | | Signor: | External | Internal |
|---|---|---|---|---|
| Master | Supply Agreement | | Michael L. O'Shaughnessy | Matthew Chan |
| Exhibit A | Products and Specifications | | MLO | MC |
| Exhibit B | Escrow Agreement | | MLO | MC |
| Exhibit C | Purchase Order Specimen | | MLO | MC |
| Exhibit D | Buyer's Customers and Terms | | MLO | MC |
| Exhibit E | Incoming Inspection Standards | | MLO | MC |

## SUPPLY AGREEMENT

This Supply Agreement (this "Agreement") is made and entered into effective as of February ____ 12, 2014 by and between the following parties:

      Element TV Company, LP, a Delaware limited partnership and

      Element Television Company, LLC, a Delaware limited liability company (collectively, "Buyer"); and

      Tongfang Global Limited, a company organized under the laws of Hong Kong ("Supplier").

Buyer and Supplier are sometimes referred to collectively as the "Parties" and individually as a "Party."

      WHEREAS, Buyer desires to purchase from Supplier, and Supplier desires to sell to Buyer, certain Semi-Knocked Down ("SKD") products.

      WHEREAS, Buyer intends to use purchased SKD products to make Complete Build Units ("CBU") at Buyer's facility in Winnsboro, South Carolina.

      WHEREAS, Buyer intends to sell CBU to its customers as listed in Exhibit D.

      NOW THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

1) Definitions.  In addition to the definitions contained in this Agreement, the following terms shall have the meanings set forth in this Section 1.

    a) "Affiliate" shall mean, with respect to any Party, any other party directly or indirectly controlling, controlled by, or under common control with such Party.  For purposes of this definition, "control" when used with respect to any party, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such party, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

    b) "Authorized Third Party" shall mean any of Buyer's Affiliates, or any Supplier-approved third party that desires to purchase Products or materials.

    c) "Intellectual Property" shall mean any and all patents (and applications therefore), trademarks (and applications therefore), trade secrets, trade names, trade dress, mask works, copyrights, other intellectual property rights or proprietary rights, ideas, concepts, know how, techniques, inventions, discoveries, improvements, documents, products, systems, practices, procedures, means, methods, designs, devices, programs, software, drawings and sketches, and trade secrets relating to the design, development, implementation, use, maintenance and upgrading of the Product.  Intellectual Property includes, but is not limited to, subject matter that falls within the

*Signatories' Initials*

Buyer      Buyer      Supplier

28588.2

definition of patentable subject matter under the laws of the U.S. or any other country or within the definition of copyrightable materials under the laws of the U.S. or any other country.

d) "Product(s)" shall mean all SKD parts, panels, television components and other related products or components that are listed on Exhibit A attached hereto and made a part hereof, as may be amended from time to time by written agreement of the parties, or as set forth in subsequent Purchase Orders, as defined below.

e) "Purchase Price" means actual bill of material ("BOM") cost as negotiated on a case-by-case basis and as set forth in each applicable Purchase Order, as defined below.

f) "Purchase Order" means a written purchase order delivered by Buyer to Supplier pursuant to this Agreement.

g) "Services" shall mean the services to be provided by Supplier under this Agreement or as set forth in a Purchase Order.

h) "Specifications" shall mean the Product specifications set forth in Exhibit A attached hereto (if any), as may from time to time either be amended by written notice by Buyer, or as set forth in subsequent Purchase Orders.

2) Agreement to Supply Products.

a) Scope. Supplier agrees to make available and to sell to Buyer any of the Products at the prices and subject to the terms set forth in this Agreement. This Agreement will apply to all Purchase Orders for all Products and Services placed by Buyer to Supplier. Supplier will manufacture and deliver Products and supply Services pursuant to this Agreement and applicable Purchase Orders.

b) Changes. Supplier shall not make changes to the Products or Specifications without the prior written approval of Buyer. Buyer may from time to time direct that modifications be made to the design of the Products. Such modifications may originate with Buyer or may be recommended by Supplier. Within fifteen (15) days following Supplier's receipt of a requested modification from Buyer, Supplier shall provide Buyer a binding estimate of the effect of such modification on the Purchase Price. If Buyer approves the estimate in writing, Supplier shall make such modifications as soon as practicable upon receipt of such notice from Buyer. Further, Supplier agrees to advise Buyer in writing of any change of material component and to ensure that any changes of any components, manufacturing processes, sources of supply, quality reporting or other major processes do not compromise Specifications, quality, or reliability of Products ordered pursuant to this Agreement. In the case of changes to material components, such notice shall be provided no less than the applicable material's lead time plus fifteen (15) days prior to the effectiveness of such change. Supplier may not make any such changes of material components without prior written approval from Buyer.

c) Product Design. Supplier will be responsible for all design, engineering, development, prototyping, manufacturing, shipping, financing and working capital needed to manufacture and export the Products to Buyer.

*Signatories' Initials*

Buyer

Buyer          Supplier  *MC*

d) <u>Quality Assurance</u>.  Supplier shall take all necessary actions to ensure that the Product complies in all respects with the Specifications and the quality approval procedures imposed by Buyer from time to time.  Without limiting the generality of the foregoing, Supplier shall comply with the following minimum quality assurance procedures:

   i) maintain quality assurance systems for the control of material quality, processing, assembly, testing, packaging and shipping in accordance with industry standards and all applicable federal state, provincial and local laws, treaties and regulations for export Products to Buyer.

   ii) make its quality assurance procedures available for review by Buyer or its designee(s), subject to reasonable confidentiality restrictions on further disclosure of Confidential Information by Buyer, or any agent acting on behalf of Buyer, as deemed reasonably necessary by Supplier and agreed to by Buyer;

   iii) Supplier will perform its standard test procedures, as well as other reasonably necessary test procedures requested by Buyer, relating to Products and Services.  Supplier will perform tests using the test equipment, procedures and software as agreed between Buyer and Supplier.

   iv) Buyer may, during normal business hours and following reasonable notice, review Supplier's facilities, quality control procedures and related records as reasonably necessary for Buyer to satisfy themselves with Supplier's compliance with its obligations under this Agreement.

   v) provide all product testing and product quality audit results to Buyer and/or its designee(s), subject to reasonable confidentiality restrictions on further disclosure of Confidential Information by Buyer, or any agent acting on behalf of Buyer, as deemed reasonably necessary by Supplier and agreed to by Buyer

   vi) Buyer will perform its own safety appropriation according to all applicable federal state, provincial and local laws, treaties and regulations when selling the Products, at Buyer's cost.

e) <u>Quality Standards</u>.  Product quality must meet all Buyer quality standards.  Defective Product shall be less than 3% for each Product shipment (the "<u>Defective Rate</u>").  If the Defective Rate exceeds 3%, Buyer shall have the right, at its discretion, to (i) take a credit for the actual defective Products in the Product shipment, or (ii) to return such Product shipment, at Supplier's sole cost and expense, for a full refund.  A Product shipment shall mean all Product(s) that Buyer reasonably believes to be affected by such defect.  A defective Product generally means any Product that is visually or operationally defective.

f) <u>Inspection</u>.  Buyer shall comply with the Incoming Inspection Standard attached hereto as <u>Exhibit E</u>.

g) <u>Services</u>.  Buyer may engage Supplier to render consulting, design, engineering or other Services in connection with Products. At a minimum, Supplier will provide the following Services at no additional cost to Buyer:

   i) Advise on all equipment and setup necessary for Buyer's South Carolina facility (the "<u>Factory</u>"), equipment, clean room and related matters in order to deliver and ship finished

*M W*
Buyer

*Signatories' Initials*
*M C O*
Buyer

Supplier *M. O.*

products out of the Factory. Buyer will purchase all such equipment from Supplier at a mutually agreed upon price and mutually agreed upon terms and timing.

ii) Provide production consultation, which will include professionals made available as mutually agreed at the Factory, including production manager, engineers and purchasing expertise (components, parts, panels, etc.).

h) <u>Purchase by Buyer's Authorized Third Parties</u>. Supplier agrees that all of Buyer's Authorized Third Parties, wherever located, shall be entitled to make offers to purchase under this Agreement; provided, however, that Buyer shall provide prior written notice to Supplier of a proposed purchase by any of Buyer's Authorized Third Parties, and Supplier shall have the right to approve or reject such purchases with or without cause. With respect to any purchases made by Authorized Third Parties, the terms and conditions of this Agreement shall govern provided that all references to "Buyer" contained in this Agreement shall refer to the Authorized Third Party, as applicable.

3) <u>Pricing</u>.

a) <u>Purchase Price</u>. Buyer shall purchase the Product from Supplier at the Purchase Price.

b) <u>Payment</u>. Payment terms for the Product shall be on open account and will match the payment terms of Buyer's customers as set forth in <u>Exhibit D</u>. Notwithstanding the foregoing, upon receipt of payment by Buyer from its customer(s), Buyer's payment to Supplier shall become immediately due and payable. Buyer and Supplier will implement an escrow account ("<u>Escrow</u>") for collecting receivables from Buyer's customers and distributing such payments to Supplier and Buyer pursuant to the terms of a mutually acceptable Escrow Agreement, attached hereto as Exhibit B and incorporated herein by this reference. Buyer agrees that all proceeds resulting from the sale of Products or CBUs assembled from Products shall be deposited into Escrow, and Buyer agrees to pay or cause to be paid any and all amounts due to Supplier hereunder.

c) <u>Late Payment</u>. If payment from Buyer's customers is not received into Escrow in accordance with the specified payment term(s) between Buyer and its customer(s) as set forth in <u>Exhibit D</u>, then Buyer shall pay a finance of 1% per month, calculated monthly from the date that title to the Products transferred from Supplier to Buyer (the "<u>Finance Charge Trigger Date</u>"), until payment from Buyer's customer is received into Escrow.

d) <u>Cost Reductions</u>. Supplier shall aggressively pursue Product and BOM cost reductions and pass all such cost reductions through to Buyer immediately when received by Supplier.

e) <u>Taxes, Etc</u>. All prices shall be in United States Dollars and are exclusive of applicable sales taxes, but are inclusive of all other charges including any charges for any reasonably necessary labeling, packing and crating, finishing or any applicable royalties or other taxes. Buyer will have no liability for any tax for which it has an appropriate exemption. Buyer will provide Supplier with evidence of such exemption. Each Party will be responsible for their respective tax liabilities.

f) <u>Quarterly Review and Reconciliation</u>. The Parties shall meet in person or by phone within thirty (30) days after the last day of each calendar quarter to conduct a Quarterly Review and Reconciliation.

*Signatories' Initials*

M W
Buyer

M W
Buyer

M.C.
Supplier

*Page 4 of 22*

During the Quarterly Review and Reconciliation, the Parties will clear any open balances and settle payment deductions, penalties, and payment amounts.

4) Product Orders.

   a) Forecasts. Buyer will provide a twelve (12) month rolling forecast of future requirements of Products (the "Forecast"). Supplier understands and agrees that any forecast that may be provided by Buyer is only an estimation of quantities required and is not binding on the Parties. Except as may be specified in a Purchase Order, projections, past purchasing history and representations about quantities to be purchased are not binding and Buyer shall not be liable for any act or expenditure by Supplier in reliance thereon.

   b) Purchase Orders. All purchases of the Product by Buyer shall be placed by Purchase Order(s) in the form specified on Exhibit C, attached hereto and incorporated herein by this reference, delivered by Buyer to Supplier at least thirty (30) days prior to the desired ship date. Purchase Orders shall identify the Product ordered, the quantity thereof, price, specific delivery dates and other relevant terms and conditions. Purchase Orders shall be accepted or rejected by Supplier, in writing, within five (5) business days of receipt thereof (excluding weekends and nationally recognized holidays). Supplier will be deemed to have rejected a Purchase Order if it fails to accept the Purchase Order by notifying Buyer within five (5) business days of its receipt thereof (excluding weekends and nationally recognized holidays). Acceptance of a Purchase Order by Supplier is a reaffirmation of its acceptance of the terms of this Agreement. Any terms or conditions attached to a Purchase Order by Buyer that are in addition to, or different from, the terms and conditions of this Agreement shall automatically be deemed rejected by Supplier unless otherwise approved in writing by Supplier. Supplier shall use its best efforts to comply with Buyer's requests to reschedule Purchase Orders.

   c) Scrap Products. Any Products that are found defective, broken or scrap prior to inclusion into a CBU by Buyer will be returned by Buyer to Seller, at Buyer's expense, for a full credit of the Purchase Price attributable to such Products.

   d) Terms and Conditions. The terms and conditions in this Agreement, and any Supplier-approved terms or conditions in a Purchase Order, shall constitute the exclusive contract terms between the Parties with respect to Buyer's purchase of the Products. In the event of any inconsistencies between the accepted terms and conditions in a Purchase Order and any terms in the body of this Agreement, the accepted terms contained in the Purchase Order shall govern. In the event of inconsistencies between the terms of this Agreement (or applicable Purchase Order) and any other documents submitted by Supplier, including, without limitation, any acceptance document or invoice, the terms of this Agreement (or applicable Purchase Order) shall govern. Buyer objects to any terms set forth in Supplier's acceptance documents (if any) or in Supplier's invoices that are different from or additional to the provisions of this Agreement (or applicable Purchase Order), and no such terms shall be binding upon Buyer unless Buyer specifically consents thereto in writing.

*Signatories' Initials*

MW
Buyer

M
Buyer

M.C,
Supplier

*Page 5 of 22*

5) <u>Shipping and Delivery</u>.

    a) <u>Shipment</u>.  Product will be shipped FOB China as set forth in each Purchase Order.  Supplier will package the Products for international shipment in accordance with standard commercial practices and in a manner that will minimize risk of damage in transit.  Invoices, packing slips and containers must bear the Purchase Order number, stock number, vendor lot number, and description of item, together with shipping quantity, in a clearly visible position.  Invoices and packing slips must be marked "complete" when final shipment is involved.

    b) <u>Delivery Schedule</u>.  Deliveries must be made in a manner to ensure receipt by Buyer at the times and under the terms specified in each Purchase Order, subject to force majeure.  TIME IS OF THE ESSENCE IN THIS AGREEMENT WITH RESPECT TO THE SPECIFIED DELIVERY DATES.

    c) <u>Late Delivery</u>.

        i) In the event Buyer incurs any costs or expenses, or other penalties, from its customers that result from Supplier's late delivery of Products and is not otherwise mutually agreed-upon, Supplier will be fully responsible for all such costs and expenses, or other penalties, and Buyer may deduct any such amounts from amounts due to Supplier.

        ii) In the event Buyer incurs any costs or expenses, or other penalties, from its customers, but Supplier did not deliver Products late, Buyer will be fully responsible for all such costs and expenses, or other penalties.

6) <u>Inspection</u>.  Supplier shall provide and maintain an adequate inspection system covering the supplies, processing methods, special tooling, materials, workmanship and Products ordered hereunder.  Supplier shall make its inspection records of all work and materials and Products available to Buyer during the term of this Agreement and for such longer period as may be necessary.  Buyer shall have the reasonable right and opportunity to inspect and test all supplies, processing methods, special tooling, materials, workmanship and Products ordered hereunder to the extent practicable at all times and places including at the places and during the periods of manufacture.  Buyer shall also have the reasonable right to inspect the place of manufacture of Suppliers from whom Supplier has purchased any supplies or materials used in the manufacture of the Products.

    a) Requirement to Share and Grant Access to Data.  Buyer shall provide Supplier the following data weekly and immediately upon the request of Supplier:  customer/retailer forecasts; production, sales, and inventory information; sell thru data; customer commitment letters; EDI data access (when permitted), and Vendor Portal Access (when permitted).

7) <u>Support and Training</u>.  Supplier shall provide Buyer or its designees with such training related to the manufacturing, operation and any other technical information relating to the Products as Buyer may reasonably deem necessary and as Supplier may reasonably provide.

*Signatories' Initials*

M.W.
*Buyer*

M.W.
*Buyer*

*Supplier* M.L.

8) Intellectual Property.

   a)  <u>Buyer Intellectual Property.</u>  Buyer shall own all Intellectual Property in (i) inventions developed by Buyer whether pre-existing or developed under this Agreement; (ii) the design of any Product developed by Buyer, or developed by Supplier at Buyer's direction under this Agreement; and (iii) inventions not previously or independently developed by Supplier or any third party that are inherent in any specifications, designs, customizations or product enhancements communicated by Buyer or developed by Supplier at the specific request of Buyer (collectively, "<u>Buyer's Intellectual Property</u>").  Buyer hereby grants Supplier a limited, non-exclusive, non-assignable license to use Buyer's Intellectual Property solely to manufacture and deliver Products to Buyer in strict accordance with this Agreement.  Title and ownership of Buyer's Intellectual Property shall remain with Buyer at all times.  Supplier shall be prohibited from using any of Buyer's Intellectual Property in any product that is not manufactured pursuant this Agreement.  Upon the expiration or termination of this Agreement, Supplier shall, as directed by Buyer, return to Buyer all documents, plans specifications, drawings and other materials in any form or media, relating to Buyer's Intellectual Property, and shall retain no copy thereof.  Supplier has a duty to, and hereby does, assign to Buyer any improvements and/or modifications to Buyer's Intellectual Property made by Supplier, its employees or agents, and Supplier hereby irrevocably appoints Buyer as Supplier's attorney-in-fact for the purpose of executing any and all documents and performing any and all other acts necessary to give effect and legality to such assignment. Supplier will promptly notify Buyer of the existence of any such improvements and/or modifications, and will fully cooperate in Buyer's pursuit of corresponding intellectual property protection.  Supplier will take all reasonable steps to ensure that its employees and agents are bound by, and cooperate in enforcing, the provisions of this paragraph.

   b)  <u>Supplier Intellectual Property.</u>  Supplier shall own all Intellectual Property in any pre-existing inventions or other proprietary property of Supplier or any inventions Supplier develops outside the scope or independent of this Agreement (collectively, "<u>Supplier's Intellectual Property</u>"). Supplier hereby grants Buyer a limited, non-exclusive, non-assignable license to use, perform, distribute Supplier's Intellectual Property, or to have any of these activities performed on its behalf, but only as is necessary to market, sell and support the Products manufactured by Supplier under this Agreement.  Title and ownership of Supplier's Intellectual Property shall remain with Supplier at all times.  Buyer shall be prohibited from using any of Supplier's Intellectual Property in any product that is not manufactured by Supplier pursuant to this Agreement.  Upon the expiration or termination of this Agreement, Buyer shall, as directed by Supplier, return to Supplier all documents, plans specifications, drawings and other materials in any form or media, relating to Supplier's Intellectual Property, and shall retain no copy thereof.  Buyer has a duty to, and hereby does, assign to Supplier any improvements and/or modifications to Supplier's Intellectual Property made by Buyer, its employees or agents, and Buyer hereby irrevocably appoints Supplier as Buyer's attorney-in-fact for the purpose of executing any and all documents and performing any and all other acts necessary to give effect and legality to such assignment. Buyer will promptly notify Supplier of the existence of any such improvements and/or modifications, and will fully cooperate in Supplier's pursuit of corresponding intellectual property protection.  Buyer will take all reasonable steps to ensure that its employees and agents are bound by, and cooperate in enforcing, the provisions of this paragraph.

*Signatories' Initials*

M.W

*Buyer*

M.W

*Buyer*

M. C.

*Supplier*

*Page 7 of 22*

c) <u>Joint Intellectual Property.</u>  Except as set forth above, the parties will decide on a case-by-case basis their respective rights with regard to the Intellectual Property inherent in any inventions that are jointly developed by the parties.  In the event the parties are unable to agree on their respective rights with regard to any such inventions, the parties shall jointly own such inventions with no obligation of accounting.  Supplier shall provide to Buyer, and maintain current, an itemized list of all trade names, trademarks, licenses, and other Intellectual Property or proprietary rights relating to the Product.

d) <u>Buyer Restrictions</u>.  Buyer will not at any time: (i) challenge Supplier's rights, title or interest in the Supplier's Intellectual Property; (ii) do, cause to be done, or omit to do anything that would in any way impair the rights of Supplier in Supplier's Intellectual Property; or (iii) represent to any third party that Buyer has any ownership or rights with respect to Supplier's Intellectual Property other than any specific rights granted to Buyer herein.

e) <u>Supplier Restrictions</u>.  Supplier will not at any time: (i) challenge Buyer's rights, title or interest in the Buyer's Intellectual Property; (ii) do, cause to be done, or omit to do anything that would in any way impair the rights of Buyer in Buyer's Intellectual Property; or (iii) represent to any third party that Supplier has any ownership or rights with respect to Buyer's Intellectual Property other than any specific rights granted to Supplier herein.

f) <u>Notice of Infringement</u>.  Each Party will notify the other Party promptly in writing of any actual or potential infringements or imitations by others of either Party's Intellectual Property in any jurisdiction(s) which come to either Party's attention during the Term of this Agreement.

g) <u>Termination of Use</u>.  Each Party acknowledges the other Party's proprietary rights in and to their respective Intellectual Property and each Party hereby waives in favor of the other Party all rights to any Intellectual Property now or hereafter originated or licensed by the other Party.  Each Party agrees that they shall not duplicate, adopt, use or register any words, phrases, symbols, designs, technology or anything else that is identical to or confusingly similar to any of the other Party's Intellectual Property.  Upon termination of this Agreement, each Party shall cease and desist from use of the other Party's Intellectual Property in any manner.

h) <u>Violation</u>.  Except as specifically set forth in this <u>Section 8</u>, nothing in this Agreement grants to either Party any rights to any Intellectual Property owned by or licensed to the other Party.  Any violation of this <u>Section 8</u> shall be deemed a material violation of this Agreement and the violated Party shall have the right to immediately terminate this Agreement and seek monetary and equitable damages.

9) <u>Representations</u>.

a) <u>Representations</u>.  Supplier represents and warrants to the Buyer that (i) all Products will be sold to Buyer, free and clear of all liens, charges, encumbrances, or other restrictions; (ii) the Products will be free from defects in manufacture, material and workmanship, and will be fit and safe for the use(s) normally and reasonably intended; (iii) the Products are of merchantable quality and are manufactured and will perform in conformance with Specifications and Supplier samples; (iv) the Products and all materials provided to Buyer under this Agreement are new products and do not contain anything used, refurbished or reconditioned; (v) the Products will not violate or

*Signatories' Initials*

MLO
*Buyer*

MLO
*Buyer*

M.C.
*Supplier*

infringe any Intellectual Property of any third party or any other right of any third party; (vi) Supplier is ISO 9002 certified, or certified by similarly recognized standards; and (vii) the Products are not produced, manufactured, assembled or packaged by the use of forced labor, prison labor or forced or illegal child labor and that the Products were not trans-shipped for the purpose of mislabeling, evading quota or country of origin restrictions or for the purpose of avoiding compliance with forced labor, prison labor or child labor laws.

b) <u>Compliance With Laws</u>.  Supplier represents and warrants that all Products will be manufactured, processed, packaged, labeled, tagged, tested, certified, accurately marked, weighed, inspected, shipped, sold, repaired and serviced in compliance with all applicable industry standards and all applicable federal, state, provincial and local laws, treaties and regulations.

c) <u>Third Party Intellectual Property Rights</u>.  Supplier represents and warrants that it has secured, and maintains in good standing, all third party Intellectual Property licenses that are required for Buyer's promotion, marketing, distribution and sale of the Products, or consumer electronics incorporating the Products.  Upon written request from Buyer, Supplier shall promptly (i) identify the existence of any third party Intellectual Property licenses applicable to or required by the Products or consumer electronics incorporating the Products ("<u>Applicable IP Agreements</u>"); (ii) provide evidence to Buyer that Supplier has executed all Applicable IP Agreements and has paid all royalties under Applicable IP Agreements for Products supplied by Supplier, including, at Buyer's discretion, either copies of royalty reports and payment information showing that the royalties have been paid or written confirmation from licensors that royalties have been paid on Products sold to Buyer.  Supplier will maintain proper books and records so as to allow the verification of amounts paid or owed to licensors in accordance with the Applicable IP Agreements.  If the use or sale of any Product, or consumer electronics incorporating any Product, by Buyer or any of its affiliates or customers is enjoined, at Buyer's request and option, and without prejudice to Buyer's other rights and remedies, Supplier will, at its cost and expense (x) procure all appropriate licenses to permit Buyer and its affiliates and customers to continue to use and sell such Products; or (y) modify the allegedly infringing Product to avoid the infringement in a manner reasonably acceptable to Buyer. In order to avoid Third Party Intellectual Property infringement claims, Buyer shall not assemble, manufacture, market, or sell Products, or consumer electronics containing Products, utilizing technology, processes, features, or other intellectual property which Supplier has not approved.

d) <u>Notification</u>.  Each Party will promptly notify the other Party upon learning of any apparent breach of the provisions contained in this <u>Section 9</u>, and the parties shall thereafter discuss a procedure to be followed to minimize any loss therefrom.  Buyer's sampling of Product or approving Product for shipment will neither relieve Supplier from the warranties contained herein nor be a waiver of any rights arising hereunder.

*Signatories' Initials*

MUO
*Buyer*

iMLO
*Buyer*

*Supplier* m. e,

10) <u>Product Warranty, Recall and Returns</u>.

    a) <u>Warranty</u>.

        i) For a twelve (12) month period commencing on April 1, 2014, as a short term solution to the current return problem, and in lieu of any warranty obligation for the Products, Supplier shall have shipped all Element-branded returned products (that Supplier has the right to manufacture and sell pursuant to that certain Trademark License Agreement dated as of December 9, 2013) from its customers to the Factory and Buyer shall own all right and title to such returned product at no additional cost.

        ii) Commencing on April 1, 2015 and thereafter, Section 10(a)(i) shall be null and void and in its place, Supplier shall provide Buyer with a 1.5% Product allowance with every Purchase Order in lieu of any warranty obligation, or the Parties may mutually agree to another warranty solution.

        iii) On or after April 1, 2014, Buyer shall be responsible to provide a customer support call center for all Element-branded products.

    b) <u>Returns</u>.  Unless otherwise set forth in a Purchase Order, Buyer will have the right to return any Products (i) that are not manufactured, packaged or labeled in accordance with the Specifications, industry standards and/or all applicable laws, ordinances, rules and regulations; (ii) that are shipped in error or in non-conformance with the applicable Purchase Order or Specifications; or (iii) that are damaged or defective, in Buyer's sole discretion, consistent with the advertised end-user warranty period.

    c) <u>Remedies</u>.  Without limiting any other rights available to Buyer, including, without limitation, Buyer's right to indemnification hereunder, in the event any Products shall not conform to the representations or warranties contained in this Agreement, or are returned by Buyer, Supplier shall, at Buyer's option, either (i) replace them without cost to Buyer, or (ii) credit or refund Buyer the Purchase Price for such Products and Buyer may offset any such amounts against amounts Buyer owes Supplier.  In addition, Supplier shall pay Buyer all other charges paid by Buyer in connection with such nonconforming Products.

11) <u>Performance</u>.  At all times during the term of this Agreement, Supplier shall maintain the necessary facilities capable of fulfilling all Purchase Orders from Buyer for timely delivery of the Product and otherwise fulfilling all obligations of Supplier under this Agreement.  Supplier will keep Buyer advised, on a commercially reasonable basis, of the status of all outstanding and undelivered Purchase Orders.  Supplier shall promptly notify Buyer if Supplier shall not be able to comply with any provision hereunder or under any term of a Purchase Order.

12) <u>Confidentiality</u>.

    a) <u>Definition</u>.  The term "<u>Confidential Information</u>" as used in this Agreement means any information or compilation of information that is proprietary to either Party and relates to the disclosing Party's existing or reasonably foreseeable business, including, without limitation, trade secrets and information relating to the Products, marketing strategies, product development and

*Signatories' Initials*

MLO
*Buyer*

MLO
*Buyer*

*Supplier*  M. l.

*Page 10 of 22*

design, Specifications, pricing, costs, financing methods, financial information, Intellectual Property, manufacturing processes, all customer information and any other information about the disclosing Party's business that is normally considered confidential or which is indicated in writing by the disclosing Party to be confidential or trade secret. Confidential Information shall not include any information that (i) is part of the public domain at the time of disclosure or becomes part of the public domain through no fault of the receiving party; (ii) was already in the receiving Party's possession, as evidenced by written documentation, prior to the disclosure of such information to the receiving Party by the disclosing Party; or (iii) is subsequently disclosed to the receiving Party on a non-confidential basis by a third party who is not under any obligation of confidentiality relating to such disclosed information.

b) <u>Nondisclosure</u>.  During the term of this Agreement and at all times thereafter, the receiving Party shall hold in the strictest of confidence and to never disclose, transfer, convey, make assessable to any person or use in any way Confidential Information of the disclosing Party for the receiving Party's own or another's benefit or permit the same to be used in competition with the disclosing Party, unless expressly agreed to in writing by the disclosing Party.

c) <u>Protective Action</u>.  The receiving Party shall protect the Confidential Information of the disclosing Party from unauthorized use or disclosure by using the same degree of care as the receiving Party uses to protect its own confidential information of a like nature, but no less than a reasonable degree of care.  The receiving Party will take reasonable precautions to prevent its employees, representatives, agents and others from disclosing or appropriating for their own use any of the Confidential Information of the disclosing Party.

d) <u>Injunctive Relief</u>.  In addition to any other relief afforded by law, the Parties shall have the right to enforce covenants contained in this <u>Section 12</u> by specific performance and preliminary, temporary and permanent injunctive relief against a recipient of such Party's Confidential Information.  Each Party agrees that the other Party shall be entitled to an injunction without the posting of any bond, enjoining or restraining any recipient from any violation or violations of the confidentiality provisions of this <u>Section 12</u>.  Damages, specific performance and injunctive relief shall be considered proper modes of relief and are not to be considered alternative remedies.

13) <u>Indemnification</u>.

a) <u>By Supplier</u>.  Supplier hereby agrees to be responsible for, to defend and indemnify Buyer and to hold its directors, officers, employees, shareholders, agents, affiliates, successors and assigns, harmless from any and all liabilities, claims, demands, causes of action or damages (including, without limitation, reasonable attorney's fees and settlement amounts) relating to or arising out of (i) any breach of representation, warranty, covenant or agreement on the part of Supplier under this Agreement; (ii) acts or omissions of Supplier relating to the manufacturing, materials or workmanship of Products which includes, but is not limited to claims that the Products, or use thereof, caused personal injury, death, or real or personal property damage; (iii) a Product recall as a result of manufacturing, materials or workmanship, whether or not initiated by Supplier; (iv) any actual or alleged infringement of any Intellectual Property or other right relating to any Product, or other breach of this Agreement; or (v) the negligence or willful misconduct of Supplier; provided, however, that in no event shall Supplier be liable for matters for which Buyer is responsible under <u>Section 13(b)</u> or for any Specification provided by Buyer.

M L b
*Buyer*

*Signatories' Initials*
M L b
*Buyer*

*Supplier* M.C.

b) <u>By Buyer</u>.  Buyer hereby agrees to be responsible for, to defend and indemnify Supplier and to hold its directors, officers, employees, shareholders, agents, affiliates, successors and assigns, harmless from any and all liabilities, claims, demands, causes of action or damages (including, without limitation, reasonable attorney's fees and settlement amounts) relating to or arising out of (i) any breach of representation, warranty, covenant or agreement on the part of Buyer under this Agreement; or (ii) acts or omissions of Buyer relating to the conversion of Products into CBUs, which includes, but is not limited to claims that the CBU, or use therof, caused personal injury, death, or real or personal property damage; (iii) a CBU recall as a result of the conversion of Products into CBUs, whether or not initiated by Buyer; (iv) any actual or alleged infringement of any Intellectual Property or other right relating to any CBU, or other breach of this Agreement; or (v) the negligence or willful misconduct of Buyer; provided that in no event shall Buyer be liable for matters for which Supplier is responsible under <u>Section 13(a)</u>.

c) <u>Third Party Claims</u>.  If a claim by a third party is made against an indemnified party and if the indemnified party intends to seek indemnity with respect thereto under this <u>Section 13</u>, such indemnified party shall promptly notify the indemnifying party of such claim; provided, however, that failure to give timely notice shall not affect the rights of the indemnified party so long as the failure to give timely notice does not adversely affect the indemnifying party's ability to defend such claim against a third party.  The indemnifying party shall be entitled to assume the defense thereof, with counsel selected by the indemnifying party and reasonably satisfactory to the indemnified party.  The indemnifying party shall have control of the defense of any such action, including any appeals and negotiations for the settlement or compromise thereof and shall have full authority to enter into a binding settlement or compromise; provided that, the indemnifying party shall not enter into any settlement or compromise which may adversely affect the indemnified party without the indemnified party's consent, which consent shall not be unreasonably withheld.  If the indemnifying party assumes the defense of such claim, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof.  The indemnified party may participate, at its own cost and expense, in the defense of any such claim; provided that such defense shall be controlled by the indemnifying party.

d) <u>Cooperation as to Indemnified Liability</u>.  Each Party hereto shall cooperate fully with the other Party with respect to access to books, records, or other documentation within such Party's control, if deemed reasonably necessary or appropriate by any Party in the defense of any claim which may give rise to indemnification hereunder.

14) <u>Insurance</u>.

a) Throughout the term of this Agreement and thereafter upon prior annual written request by either party, for each of the five (5) years following the date of expiration or termination of this Agreement, each party, at their sole cost and expense, shall obtain and maintain, or be covered through its parent, the following insurance policies from a recognized insurance company qualified to do business in the United States of America or such other jurisdictions as either party may from time to time request:

i) Comprehensive General Liability (including product, shipping loss, fire, theft, and completed operations), with a minimum of $5,000,000 general aggregate limit; $5,000,000 products and

*Signatories' Initials*

MLD
Buyer

MLD
Buyer

Supplier  M.C,

completed operations aggregate limit; and $2,000,000 each occurrence, written on an occurrence form; and

ii) Product Liability insurance, providing protection in the following amount of coverage: $5,000,000 combined single limit against any claims, demands, or causes of action or damages, including reasonable attorney's fees, arising out of any alleged defects in such articles, or any sale, distribution or use thereof.

b) Annually, upon each renewal (or at other appropriate intervals), each party will supply the other party with a Certificate of Insurance with respect to each of the foregoing policies that names such party, its subsidiaries, parent, affiliates and licensors as Additional Insureds, and which also provides that such insurance will not be canceled or changed unless at least thirty (30) days prior written notice has been given to such party. Coverage and limits referred to above shall not in any way limit the liability of either party and may be required to be increased to stay current with industry standards.

15) <u>Term</u>. This Agreement will take effect on the date first written above and will continue in full force and effect for an initial period of one (1) year (the "<u>Initial Term</u>"). Upon expiration of the Initial Term, this Agreement will automatically extend and renew for successive one year terms (each a "<u>Renewal Term</u>" and, collectively, the "<u>Renewal Terms</u>"), unless either party gives notice of its election to not renew this Agreement at the end of the Initial Term or any Renewal Term, as applicable, upon 180 days prior written notice to the other party. The Initial Term and each applicable Renewal Term will collectively be defined as the "<u>Term</u>."

16) <u>Termination</u>. In addition to the foregoing, this Agreement may be terminated in any manner provided below:

a) <u>Breach of Agreement</u>. Either party may either terminate this Agreement in its entirety by written notice if the other party is in material breach of this Agreement and fails to cure the breach within 30 days of receipt of first written notice of the breach, or if it is not reasonably possible to cure such breach within such 30 day time period, then the breach shall be cured within the shortest possible reasonable time to cure, which in no event shall be longer than 90 days.

b) <u>Other Termination Events</u>. Buyer or Supplier (as appropriate) may immediately terminate this Agreement in its entirety upon the following events:

i) Any change in the ownership of Supplier that materially affects Buyer; or

ii) Buyer or Supplier is not in compliance with all applicable federal, state, provincial and local laws, treaties and regulations relating to the operation of its business.

17) <u>Rights and Obligations Upon Termination</u>. Upon termination of this Agreement, the following provisions shall apply:

a) <u>Return of Confidential Information</u>. Upon termination of this Agreement, each Party shall, within 10 days after the effective date of such termination, return to the other Party all copies of

M⋁Ö
*Buyer*

*Signatories' Initials*
M W
*Buyer*

M.C,
*Supplier*

materials and documents or copies thereof containing any Confidential Information of the other Party.

b) <u>Open Purchase Orders</u>.  Upon termination of this Agreement, all Purchase Orders submitted by Buyer and accepted by Supplier will remain in effect and be delivered upon by Supplier in accordance with their terms and this Agreement.  Buyer shall pay for all Products shipped by Supplier pursuant to confirmed Purchase Orders in accordance with the terms contained in this Agreement.

c) <u>Existing Accounts Receivable</u>.  Buyer shall pay when due any invoices issued by Supplier for Products manufactured and shipped prior to the effective date of expiration or termination of this Agreement in accordance with the terms and conditions of this Agreement.  Supplier shall pay Buyer, upon demand, any credit balance.

d) <u>Reservation of Rights and Remedies</u>.  Any Party who terminates this Agreement in accordance with the terms of this Agreement shall also have all other rights and remedies available under law or equity for any claim it may have against the other Party whether for breach of contract or otherwise.

e) <u>Surviving Obligations</u>.  Each Party's rights and obligations under the provisions of each section that, by their nature, should survive the termination of this Agreement, including, without limitation, Sections 8, 12, and 19, shall survive any termination of this Agreement and continue in full force and effect.

18) <u>Notices</u>.  Unless otherwise directed in writing by a Party, all notices, demands, waivers, requests, consents and other communications under this Agreement shall be in writing and shall be deemed to have been delivered on the date personally delivered or on the date deposited in the United States Postal Service, postage prepaid, by certified mail, return receipt requested, delivered by Federal Express overnight delivery, or delivered by electronic facsimile and confirmed:

*If to Supplier:*

TONGFANG GLOBAL LIMITED
9F, Sector D of Tong Fang Information Harbor,
Lang Shan Rd., Hi-tech Industrial Park (North)
Nan Shan District, Shenzhen China
Tel.: +86-755-3301 0849
Fax: +86-755-3301 0002

*If to Buyer:*

Element TV Company, LP
10909 Valley View Road
Eden Prairie, Minnesota 55344
Telephone:    (612) 669-7708

Element Television Company, LLC
10909 Valley View Road
Eden Prairie, Minnesota 55344
Telephone:    (612) 669-7708

*Signatories' Initials*

M L b
Buyer

M L b
Buyer

Supplier M. C.

19) <u>General Provisions</u>.

   a) <u>Controlling Law</u>. This Agreement shall be interpreted and governed by the laws of the State of Delaware, USA, without application of its conflict of law provisions. The Uniform Commercial Code as it is enacted in the state of Delaware shall govern this Agreement. Any action brought under this Agreement must be venued in either the jurisdiction of the courts of the Hong Kong Special Administrative Region of the People's Republic of China or in any state in the United States of America, with the choice of such venue made by the Plaintiff. The parties hereby submit to the jurisdiction as selected pursuant to this provision.

   b) <u>No Offset</u>. Neither party's obligation to make payments under this Agreement may be offset by the other party's obligations to make payments under other agreements.

   c) <u>Severability</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

   d) <u>Existence and Authority</u>. Buyer and Supplier each hereby represent and warrant that (i) such Party is validly incorporated or organized under the laws of the jurisdiction of its incorporation or organization, is validly existing and authorized to do business in the jurisdictions where such Party currently does business; (ii) such Party has full power and authority to enter into and deliver this Agreement and to perform its obligations hereunder; (iii) such Party has duly authorized the person executing this Agreement on behalf of such Party to do such; and (iv) this Agreement constitutes the legal, valid and binding obligations of each Party hereto, enforceable against it in accordance with its terms.

   e) <u>Government Authorization</u>. No notification, authorization, consent or approval of, or notice to, or filing or registration with, any governmental authority is required to be obtained or given, and no waiting period is required to expire, in connection with each Party's execution and delivery of this Agreement and the performance of its obligations hereunder.

   f) <u>Entire Agreement</u>. This Agreement contains the entire contract between the Parties as to the subject matter hereof and supersedes any prior or contemporaneous written or oral agreements between the Parties with respect to the subject matter hereof.

   g) <u>Modifications and Waivers</u>. No purported amendment, modification or waiver of any provision of this Agreement shall be binding unless set forth in a written document signed by all Parties (in the case of amendments and modifications) or by the Party to be charged thereby (in the case of waivers). Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term or provision of this Agreement or of the same circumstance or event upon any recurrence thereof. Any failure by any Party to detect, protest, or remedy any breach of this Agreement shall not constitute a waiver or impairment of any such term or condition, or the right of such Party at any time to avail itself of such remedies as it may have for any breach or breaches of such term or condition.

   h) <u>Further Assurances</u>. From time to time, at the request of any Party hereto and at the expense of the Party so requesting, each Party shall execute and deliver to the requesting Party such

*Signatories' Initials*

Buyer

Buyer

Supplier

28588.2

documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.

i) <u>Assignment/Binding Nature.</u> Neither Party may delegate any of its duties or assign any of its rights under this Agreement to any third party unless the other Party has specifically consented to such delegation or assignment in writing. This Agreement shall be binding upon each Party's successors and assigns and upon each Party's successors and permitted assigns approved by the other Party as provided above.

j) <u>No Partnership; Joint Venture; Agency.</u> This Agreement does not constitute and shall not be construed as constituting a partnership under applicable state law nor a joint venture agreement among the Parties. No Party shall have any right to obligate or bind another Party in any manner whatsoever as a result of this Agreement, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons. Neither Buyer on one hand nor Supplier on the other are intended to be nor shall be considered an agent for the other.

k) <u>Force Majeure.</u> Neither Party shall be in default by reason of any failure in performance of this Agreement if such failure arises, directly or indirectly, out of causes reasonably beyond the direct control of or foreseeable by such Party, including, but not limited to, acts of God or of the public enemy, U.S. or foreign governmental acts in either a sovereign or contractual capacity, fire, wind, flood, accident, epidemic, restrictions, strikes or freight embargoes or because of any law, order, proclamation, regulation or ordinance of any governmental authority or any other unforeseeable act or action of like character.

l) <u>Construction.</u> Should any provision of this Agreement require judicial interpretation, the Parties agree that the forum interpreting or construing the same shall not apply a presumption that this Agreement shall be more strictly construed against one Party than another.

m) <u>English Language Controls.</u> This Agreement and all related Purchase Orders and other documents shall be construed and interpreted in the English language. If this Agreement exists in another language, the English version of this Agreement shall be the official version and shall control. All monetary amounts referenced herein shall be in United States dollars.

n) <u>Counterparts; Facsimile.</u> This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and each of which alone and all of which together, shall constitute one and the same instrument, but in making proof of this Agreement it shall not be necessary to produce or account for each copy of any counterpart other than the counterpart signed by the Party against whom this Agreement is to be enforced. This Agreement may be transmitted by facsimile, and it is the intent of the Parties for the facsimile (or a photocopy thereof) of any autograph printed by a receiving facsimile machine to be an original signature and for the facsimile (or a photocopy thereof) and any complete photocopy of the Agreement to be deemed an original counterpart.

(Signature page immediately follows.)

*Signatories' Initials*

NLV                 MLV                     M.Q.
Buyer               Buyer                   Supplier

28588.2

IN WITNESS WHEREOF, the parties hereto have caused this Supply Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

*Buyer:*                                                    *Supplier:*

**ELEMENT TV COMPANY, LP**                    **TONGFANG GLOBAL LIMITED**
*By its General Partner*
**ELEMENT TELEVISION COMPANY, LLC**

_____          By: _MATTHEW CHAN,_
Michael L. O'Shaughnessy, President          Its: _DEPUTY GENERAL MANAGER_

*Buyer:*

**ELEMENT TELEVISION COMPANY, LLC**

_____
Michael L. O'Shaughnessy, President

*Signatories' Initials*

_MW_          _MW_          Supplier _M.C,_
Buyer          Buyer

28588.2

## EXHIBIT A TO SUPPLY AGREEMENT
### *Products and Specifications*

*Signatories' Initials*

MLO
Buyer

MLO
Buyer

Supplier M.l.

*Page 18 of 22*

28588.2

## EXHIBIT B TO SUPPLY AGREEMENT
### *Escrow Agreement*

## EXHIBIT C TO SUPPLY AGREEMENT
*Purchase Order Specimen*

*Signatories' Initials*

~~MW~~
Buyer

~~MW~~
Buyer

Supplier *M. C.*

*Page 20 of 22*

*28588.2*

## EXHIBIT D TO SUPPLY AGREEMENT
*Buyer's Customers and Terms*

*Signatories' Initials*

Buyer

Buyer

Supplier

## EXHIBIT E TO SUPPLY AGREEMENT
### *Incoming Inspection Standards*

*Signatories' Initials*

Mio
Buyer

Miw
Buyer

Supplier   M. C.

*Page 22 of 22*

# SUPPLY AGREEMENT
## 供應協議

This Supply Agreement (this "<u>Agreement</u>") is made and entered into effective as of February___12, 2014 by and between the following parties:

本供應協議（以下稱「<u>本協議</u>」）由下列雙方於 2014 年 2 月 12 日簽署生效：

      Element TV Company, LP, a Delaware limited partnership and

      Element TV Company, LP，一家達拉威爾州有限合夥組織；及

      Element Television Company, LLC, a Delaware limited liability company (collectively, "Buyer"); and

      Element Television Company, LLC，一家達拉威爾州有限責任公司（以下合稱「買方」）；及

      Tongfang Global Limited, a company organized under the laws of Hong Kong ("Supplier").

      同方國際有限公司，一家依照香港法律組織的公司（以下稱「供應商」）。

Buyer and Supplier are sometimes referred to collectively as the "Parties" and individually as a "Party."

買方與供應商有時合稱為「雙方」，各自稱為「一方」。

      WHEREAS, Buyer desires to purchase from Supplier, and Supplier desires to sell to Buyer, certain Semi-Knocked Down ("SKD") products.

      鑑於，買方希望向供應商購買，供應商希望出售給買方，某些「半散裝」產品。

      WHEREAS, Buyer intends to use purchased SKD products to make Complete Build Units ("CBU") at Buyer's facility in Winnsboro, South Carolina.

      鑑於，買方計畫在位於南卡羅來納州 Winnsboro 市的買方廠內，將所購買的半散裝產品用於製作「整機」產品。

      WHEREAS, Buyer intends to sell CBU to its customers as listed in <u>Exhibit D</u>.

      鑑於，買方計畫將整機產品出售給<u>附件 D</u> 所列之客戶。

      NOW THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

      因此，以本協議所規定之雙方承諾及其他有效承諾作為對價，雙方同意下列條款：

1) <u>Definitions</u>. In addition to the definitions contained in this Agreement, the following terms shall have the meanings set forth in this <u>Section 1</u>.

      <u>定義</u>。除了本協議所規定之定義外，下列用語應具備此<u>第 1 條</u>所規定之意義。

    a) "<u>Affiliate</u>" shall mean, with respect to any Party, any other party directly or indirectly controlling, controlled by, or under common control with such Party. For purposes of this definition, "control" when used with respect to any party, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such party, whether through the ownership of voting securities by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

任一方的「關係企業」，指直接或間接控制該方，由該方所控制，或與該方受同一控制
之任何其他方。就本定義之目的而言，任一方的「控制權」，指透過具投票權證券之所
有權、契約或其他方式，直接或間接持有決定或促成決定該方管理及政策方向之權力；
所謂「控制」及「受控制」也具備關於上述的意義。

b) "Authorized Third Party" shall mean any of Buyer's Affiliates, or any Supplier-approved third party that desires to purchase Products or materials.

「經授權第三方」指希望購買產品或材料的任何買方關係企業，或任何經供應商同意的第三方。

c) "Intellectual Property" shall mean any and all patents (and applications therefore), trademarks (and applications therefore), trade secrets, trade names, trade dress, mask works, copyrights, other intellectual property rights or proprietary rights, ideas, concepts, know how, techniques, inventions, discoveries, improvements, documents, products, systems, practices, procedures, means, methods, designs, devices, programs, software, drawings and sketches, and trade secrets relating to the design, development, implementation, use, maintenance and upgrading of the Product. Intellectual Property includes, but is not limited to, subject matter that falls within the definition of patentable subject matter under the laws of the U.S. or any other country or within the definition of copyrightable materials under the laws of the U.S. or any other country.

「智慧財產」指任何及所有專利（專利申請）、商標（商標申請）、貿易機密、商名、商
業外觀、掩膜作品、著作權、其他智慧財產權或專屬權、想法、概念、技術密窯、技術、
發明、發現、改良、文件、產品、系統、作法、程序、方法、方式、設計、設置、程式、
軟體、繪圖與繪圖，以及關於產品設計、開發、執行、使用、維持及升級的貿易機密。
智慧財產包括但不限於依照美國或任何其他國家法律可以申請專利的事項，或依照美國
或任何其他國家法律可以申請著作權的內容。

d) "Product(s)" shall mean all SKD parts, panels, television components and other related products or components that are listed on Exhibit A attached hereto and made a part hereof, as may be amended from time to time by written agreement of the parties, or as set forth in subsequent Purchase Orders, as defined below.

「產品」指附件 A 所列，或如下定義之後續訂單所列之所有半散裝零件、板、電視元件
及其他相關產品或元件。附件 A 屬本協議一部分，可由雙方書面同意不時修改。

e) "Purchase Price" means actual bill of material ("BOM") cost as negotiated on a case-by-case basis and as set forth in each applicable Purchase Order, as defined below.

「買價」指依照個案協商，於如下定義之相關訂單中所規定的實際物料清單成本。

f) "Purchase Order" means a written purchase order delivered by Buyer to Supplier pursuant to this Agreement.

「訂單」指由買方依照本協議交付給供應商書面訂單。

g) "Services" shall mean the services to be provided by Supplier under this Agreement or as set forth in a Purchase Order.

「服務」指供應商依照本協議所提供，或訂單所規定的服務。

h) "Specifications" shall mean the Product specifications set forth in Exhibit A attached hereto (if any), as may from time to time either be amended by written notice by Buyer, or as set

forth in subsequent Purchase Orders.

「規格」指附件 A 所列（若有），或後續訂單所規定之產品規格。附件 A 所列規格可能由買方透過書面通知不時修改。

2) Agreement to Supply Products.
供應產品協議。

a) Scope. Supplier agrees to make available and to sell to Buyer any of the Products at the prices and subject to the terms set forth in this Agreement. This Agreement will apply to all Purchase Orders for all Products and Services placed by Buyer to Supplier. Supplier will manufacture and deliver Products and supply Services pursuant to this Agreement and applicable Purchase Orders.
範圍。供應商同意依照本協議規定的價格及條件，提供任何產品出售給買方。關於所有產品及服務，由買方對供應商所下的所有訂單，均適用本協議。供應商將依照本協議及相關訂單製造產品，交付產品及提供服務。

b) Changes. Supplier shall not make changes to the Products or Specifications without the prior written approval of Buyer. Buyer may from time to time direct that modifications be made to the design of the Products. Such modifications may originate with Buyer or may be recommended by Supplier. Within fifteen (15) days following Supplier's receipt of a requested modification from Buyer, Supplier shall provide Buyer a binding estimate of the effect of such modification on the Purchase Price. If Buyer approves the estimate in writing, Supplier shall make such modifications as soon as practicable upon receipt of such notice from Buyer. Further, Supplier agrees to advise Buyer in writing of any change of material component and to ensure that any changes of any components, manufacturing processes, sources of supply, quality reporting or other major processes do not compromise Specifications, quality, or reliability of Products ordered pursuant to this Agreement. In the case of changes to material components, such notice shall be provided no less than the applicable material's lead time plus fifteen (15) days prior to the effectiveness of such change. Supplier may not make any such changes of material components without prior written approval from Buyer.
變更。未經買方事先書面同意，供應商不得變更產品或規格。買方得不時要求修改產品設計。此類修改可以由買方提出，也可以由供應商建議。供應商收到買方的修改要求後，應於十五（15）日內，將修改對買價的具拘束力預測影響提供給買方。若買方書面同意此項預測，供應商應於收到買方通知後儘速進行修改。此外，供應商同意，若有任何重要元件發生變化，應書面通知買方，並應確保任何元件、製造流程、供應物來源、品質報告或其他重要流程之任何改變，均不得對依照本協議訂購產品之規格、品質或可靠性產生影響。重要元件若有變更，在變更生效前必須提前通知，通知期間應為相關材料的交貨期間外加十五（15）日。未經買方事先書面同意，供應商不得對重要元件進行上述修改。

c) Product Design. Supplier will be responsible for all design, engineering, development, prototyping, manufacturing, shipping, financing and working capital needed to manufacture and export the Products to Buyer.
產品設計。供應商將負責產品製造及出口至買方所需之所有設計、工程、開發、原型、製造、運送、融資及營運資金。

d) Quality Assurance. Supplier shall take all necessary actions to ensure that the Product complies in all respects with the Specifications and the quality approval procedures imposed

by Buyer from time to time. Without limiting the generality of the foregoing, Supplier shall comply with the following minimum quality assurance procedures:

品質控管。供應商應採取所有所需行動，確保產品在各方面均符合規格，以及買方不時要求的品質核准程序。在不影響上述一般性規定之前提下，供應商應遵守下列最低品質控管程序：

i)  maintain quality assurance systems for the control of material quality, processing, assembly, testing, packaging and shipping in accordance with industry standards and all applicable federal state, provincial and local laws, treaties and regulations for export Products to Buyer.
    維持品質控管系統，依照行業標準，以及將產品出口給買方的所有相關聯邦、州立、省立及地方法律、公約及規則，控制材料品質、加工、組裝、測試、包裝及運送。

ii) make its quality assurance procedures available for review by Buyer or its designee(s), subject to reasonable confidentiality restrictions on further disclosure of Confidential Information by Buyer, or any agent acting on behalf of Buyer, as deemed reasonably necessary by Supplier and agreed to by Buyer;
    將品質控管程序提交給買方或買方指定人審查，買方或代表買方的任何代理人，對於機密資訊之披露應受到供應商認為需要，且經買方同意之合理保密限制；

iii) Supplier will perform its standard test procedures, as well as other reasonably necessary test procedures requested by Buyer, relating to Products and Services. Supplier will perform tests using the test equipment, procedures and software as agreed between Buyer and Supplier.
     關於產品及服務，供應商將執行標準測試程序，以及買方所要求其他合理必須的測試程序。供應商將使用買方及供應商相互約定的測試設備、程序及軟體進行測試。

iv) Buyer may, during normal business hours and following reasonable notice, review Supplier's facilities, quality control procedures and related records as reasonably necessary for Buyer to satisfy themselves with Supplier's compliance with its obligations under this Agreement.
    買方得於正常工作時間內，於合理通知後，依照合理需要，檢查供應商的場所、品質控管程序及相關記錄，以確保供應商遵守本協議所規定之義務。

v)  provide all product testing and product quality audit results to Buyer and/or its designee(s), subject to reasonable confidentiality restrictions on further disclosure of Confidential Information by Buyer, or any agent acting on behalf of Buyer, as deemed reasonably necessary by Supplier and agreed to by Buyer
    將所有產品測試及產品品質稽核結果提供給買方及／或買方指定人，買方或代表買方的任何代理人，對於機密資訊之披露應受到供應商認為需要，且經買方同意之合理保密限制

vi) Buyer will perform its own safety appropriation according to all applicable federal state, provincial and local laws, treaties and regulations when selling the Products, at Buyer's cost.
    買方出售產品時，將依照所有相關聯邦、州立、省立及當地法律、公約及規定進行買方本身的安全措施，費用由買方自行承擔。

e)  <u>Quality Standards</u>. Product quality must meet all Buyer quality standards. Defective Product

shall be less than 3% for each Product shipment (the "Defective Rate"). If the Defective Rate exceeds 3%, Buyer shall have the right, at its discretion, to (i) take a credit for the actual defective Products in the Product shipment, or (ii) to return such Product shipment, at Supplier's sole cost and expense, for a full refund. A Product shipment shall mean all Product(s) that Buyer reasonably believes to be affected by such defect. A defective Product generally means any Product that is visually or operationally defective.

品質標準。產品品質必須符合所有買方品質標準。瑕疵產品不得超過每批出貨產品的 3%（「瑕疵比例」）。若瑕疵比例超過 3%，買方有權自行決定(i)將實際瑕疵產品於已出貨產品中扣除，或(ii)退還該批產品，成本費用由供應商自行承擔，全額退款。一批產品指買方合理認為受到瑕疵影響的所有產品。瑕疵產品通常指在外觀上或操作上具瑕疵的任何產品。

f)  Inspection. Buyer shall comply with the Incoming Inspection Standard attached hereto as Exhibit E.

檢查。買方應遵守附件 E 進貨檢查標準。

g)  Services. Buyer may engage Supplier to render consulting, design, engineering or other Services in connection with Products. At a minimum, Supplier will provide the following Services at no additional cost to Buyer.

服務。買方得委託供應商關於產品提供顧問、設計、工程或其他服務。供應商應至少提供下列服務，不得向買方另外收費。

i)  Advise on all equipment and setup necessary for Buyer's South Carolina facility (the "Factory"), equipment, clean room and related matters in order to deliver and ship finished products out of the Factory. Buyer will purchase all such equipment from Supplier at a mutually agreed upon price and mutually agreed upon terms and timing.

關於買方南卡羅來納州工廠（「工廠」）所需的所有設備及裝設、設備、清潔室及相關事項提供諮詢，以便工廠得以就成品進行交貨及出貨。買方將依照雙方同意的價格、條件及時間，向供應商購買所有設備。

ii) Provide production consultation, which will include professionals made available as mutually agreed at the Factory, including production manager, engineers and purchasing expertise (components, parts, panels, etc.).

提供生產諮詢，包括依照雙方約定在工廠提供專業人士，包括生產經理、工程師及採購專長（元件、零件、板等）。

h)  Purchase by Buyer's Authorized Third Parties. Supplier agrees that all of Buyer's Authorized Third Parties, wherever located, shall be entitled to make offers to purchase under this Agreement; provided, however, that Buyer shall provide prior written notice to Supplier of a proposed purchase by any of Buyer's Authorized Third Parties, and Supplier shall have the right to approve or reject such purchases with or without cause. With respect to any purchases made by Authorized Third Parties, the terms and conditions of this Agreement shall govern provided that all references to "Buyer" contained in this Agreement shall refer to the Authorized Third Party, as applicable.

買方授權第三方之採購。供應商同意，所有買方授權第三方，無論任何地點，捐有權要求依照本協議採購，但任何買方授權第三方要求採購時，買方應事先書面通知供應商，供應商有權具理由或不具理由同意或拒絕。關於經授權第三方所進行的採購，應適用本協議之條件條款，但本協議所稱「買方」均應指授權第三方。

3) Pricing.
 定價。

a) Purchase Price. Buyer shall purchase the Product from Supplier at the Purchase Price.
買價。買方應依照買價向供應商採購產品。

b) Payment. Payment terms for the Product shall be on open account and will match the payment terms of Buyer's customers as set forth in Exhibit D. Notwithstanding the foregoing, upon receipt of payment by Buyer from its customer(s), Buyer's payment to Supplier shall become immediately due and payable. Buyer and Supplier will implement an escrow account ("Escrow") for collecting receivables from Buyer's customers and distributing such payments to Supplier and Buyer pursuant to the terms of a mutually acceptable Escrow Agreement, attached hereto as Exhibit B and incorporated herein by this reference. Buyer agrees that all proceeds resulting from the sale of Products or CBUs assembled from Products shall be deposited into Escrow, and Buyer agrees to pay or cause to be paid any and all amounts due to Supplier hereunder.
付款。產品付款條件應依照往來帳戶，符合附件 D 所列之買方客戶付款條件。雖有上述規定，買方收到客戶款項後，應立刻向供應商付款。買方及供應商將設定一個監管帳戶（「監管帳戶」），依照雙方所同意的監管協議規定，收取買方客戶的應收帳款，向供應商及買方支付款項。監管協議如附件 B，屬本協議一部分。買方同意，銷售產品或由產品所組成整機而獲得之所有款項，均應存入監管帳戶，且買方同意支付或請他人支付依照本協議應支付給供應商的任何及所有金額。

c) Late Payment. If payment from Buyer's customers is not received into Escrow in accordance with the specified payment terms(s) between Buyer and its customer(s) as set forth in Exhibit D, then Buyer shall pay a finance of 1% per month, calculated monthly from the date that title to the Products transferred from Supplier to Buyer (the "Finance Charge Trigger Date"), until payment from Buyer's customer is received into Escrow.
付款延遲。若買方客戶款項未依照買方與客戶之間如附件 D 所規定之付款條件支付至監管帳戶，買方應支付每月 1%的利息，自產品所有權自供應商轉至買方之日（「利息起算日」）起，至買方客戶款項支付至監管帳戶為止，按月計算。

d) Cost Reductions. Supplier shall aggressively pursue Product and BOM cost reductions and pass all such cost reductions through to Buyer immediately when received by Supplier.
成本降低。供應商應積極追求產品及整機成本的降低，自供應商獲得成本降低起立刻全部轉給買方。

e) Taxes. Etc. All prices shall be in United States Dollars and are exclusive of applicable sales taxes, but are inclusive of all other charges including any charges for any reasonably necessary labeling, packing and crating, finishing or any applicable royalties or other taxes. Buyer will have no liability for any tax for which it has an appropriate exemption. Buyer will provide Supplier with evidence of such exemption. Each Party will be responsible for their respective tax liabilities.
稅務等。所有價格均為美元，不包含相關銷售稅，但包含所有其他費用，包括任何合理所需的標籤、包裝與裝箱、拋光費用，以及任何相關權利金或其他稅務。買方可適當免稅時，無須負任何稅務責任。買方將提供供應商免稅證明。各方應負擔各自的稅務責任。

f) <u>Quarterly Review and Reconciliation.</u> The Parties shall meet in person or by phone within thirty (30) days after the last day of each calendar quarter to conduct a Quarterly Review and Reconciliation.
<u>季度檢討及核對</u>。每個季度結束後三十（30）日內，雙方應會面或通電話，進行季度檢討及核對。

5) <u>Shipping and Delivery</u>.
<u>出貨與交貨</u>。

   a) <u>Shipment</u>. Product will be shipped FOB China as set forth in each Purchase Order. Supplier will package the Products for international shipment in accordance with standard commercial practices and in a manner that will minimize risk of damage in transit. Invoices, packing slips and containers must bear the Purchase Order number, stock number, vendor lot number, and description of item, together with shipping quantity, in a clearly visible position. Invoices and packing slips must be marked "complete" when final shipment is involved
   <u>出貨</u>。產品將依照每張訂單規定，以「船上交貨」至中國的條件出貨。供應商將依照標準商業慣例，使用將運輸損害降至最低的方式，對產品進行國際運輸包裝。發票、包裝清單及貨櫃，都必須記載在清晰位置訂單編號、庫存編號、賣方批次編號，並記載物品描述，以及出貨數量。若屬最後一批貨品，發票及包裝清單必須註明「完整」。

   b) <u>Delivery Schedule.</u> Deliveries must be made in a manner to ensure receipt by Buyer at the times and under the terms specified in each Purchase Order, subject to force majeure. TIME IS OF THE ESSENCE IN THIS AGREEMENT WITH RESPECT TO THE SPECIFIED DELIVERY DATES.
   <u>交貨時程</u>。交貨方式必須讓買方可以在每個訂單規定的時間及條件收貨，但不可抗力除外。關於所指定的交貨日期，時間屬本協議下的關鍵因素。

   c) <u>Late Delivery</u>.
   <u>延遲交貨</u>。

      i) In the event Buyer incurs any costs or expenses, or other penalties, from its customers that result from Supplier's late delivery of Products and is not otherwise mutually agreed-upon, Supplier will be fully responsible for all such costs and expenses, or other penalties, and Buyer may deduct any such amounts from amounts due to Supplier.
      因供應商產品交貨延遲，導致買方就客戶產生任何成本、費用或其他罰金，除雙方另有約定外，全部成本、費用或其他罰金應由供應商全額負責，買方得於應支付給供應商的金額中扣除任何此類款項。

      ii) In the event Buyer incurs any costs or expenses, or other penalties, from its customers, but Supplier did not deliver Products late, Buyer will be fully responsible for all such costs and expenses, or other penalties.
      若買方就客戶產生任何成本、費用或其他罰金，但供應商的產品交貨並無延遲，全部成本、費用或其他罰金應由買方全額負責。

6) <u>Inspection</u>. Supplier shall provide and maintain an adequate inspection system covering the supplies, processing methods, special tooling, materials, workmanship and Products ordered hereunder. Supplier shall make its inspection records of all work and materials and Products available to Buyer during the term of this Agreement and for such longer period as may be

necessary. Buyer shall have the reasonable right and opportunity to inspect and test all supplies, processing methods, special tooling, materials, workmanship and Products ordered hereunder to the extent practicable at all times and places including at the places and during the periods of manufacture. Buyer shall also have the reasonable right to inspect the place of manufacture of Suppliers from whom Supplier has purchased any supplies or materials used in the manufacture of the Products.

檢驗。供應商應提供並維持充分的檢驗系統，涵蓋供應物、加工方式、特殊工具、材料、作工及依照本協議訂購之產品。在本協議期間，及所需的較長期間內，供應商應將所有工作、材料及產品的檢驗記錄提供給買方。在可行範圍內，買方應有合理的權利及機會，可以在所有時間及地點，檢查測試所有供應物、加工方法、特殊工具、材料、作工及依照本協議訂購的產品，包括製造地點及製造期間。供應商自其他供應商購買任何供應物或材料，用於產品之製造時，買方亦應有合理權利，可以檢查此類次供應商的製造地點。

   a) Requirement to Share and Grant Access to Data. Buyer shall provide Supplier the following data weekly and immediately upon the request of Supplier: customer/retailer forecasts; production, sales, and inventory information; sell thru data; customer commitment letters; EDI data access (when permitted), and Vendor Portal Access (when permitted).

   資料分享與存取規定。買方應按週，或於供應商要求時，提供供應商下列資料：客戶／零售商預測；生產、銷售及庫存資訊；受督率；客戶承諾函；電子數據交換使用（若允許），以及賣方門戶使用（若允許）。

7) Support and Training. Supplier shall provide Buyer or its designees with such training related to the manufacturing, operation and any other technical information relating to the Products as Buyer may reasonably deem necessary and as Supplier may reasonably provide.

   支援及訓練。供應商應提供買方或買方指定人，買方合理認為需要，且供應商可合理提供，關於製造、操作，以及與產品相關任何其他技術資訊的訓練。

   During the Quarterly Review and Reconciliation, the Parties will clear any open balances and settle payment deductions, penalties, and payment amounts.

   在每季度檢討及核對時，雙方將清算任何餘額，結算付款抵扣、罰金及付款金額。

4) Product Orders.

   產品訂單。

   a) Forecasts. Buyer will provide a twelve (12) month rolling forecast of future requirements of Products (the "Forecast"). Supplier understands and agrees that any forecast that may be provided by Buyer is only an estimation of quantities required and is not binding on the Parties. Except as may be specified in a Purchase Order, projections, past purchasing history and representations about quantities to be purchased are not binding and Buyer shall not be liable for any act or expenditure by Supplier in reliance thereon.

   預測。買方將提供十二（12）個月產品未來需求的滾動性預測（「預測」）。供應商理解且同意，買方所提供的任何預測，均僅為對所需數量的估計，對雙方無拘束力。除非訂單中有規定，預測、過去採購歷史，或關於將採購數量的聲明，均不產生拘束力，供應商因此所進行或產生的任何行為或費用，買方均不負責。

   b) Purchase Orders. All purchases of the Product by Buyer shall be placed by Purchase Order(s) in the form specified on Exhibit C, attached hereto and incorporated herein by this reference, delivered by Buyer to Supplier at least thirty (30) days prior to the desired ship date. Purchase Orders shall identify the Product ordered, the quantity thereof, price, specific delivery dates

and other relevant terms and conditions. Purchase Orders shall be accepted or rejected by Supplier, in writing, within five (5) business days of receipt thereof (excluding weekends and nationally recognized holidays). Supplier will be deemed to have rejected a Purchase Order if it fails to accept the Purchase Order by notifying Buyer within five (5) business days of its receipt thereof (excluding weekends and nationally recognized holidays). Acceptance of a Purchase Order by Supplier is a reaffirmation of its acceptance of the terms of this Agreement. Any terms or conditions attached to a Purchase Order by Buyer that are in addition to, or different from, the terms and conditions of this Agreement shall automatically be deemed rejected by Supplier unless otherwise approved in writing by Supplier. Supplier shall use its best efforts to comply with Buyer's requests to reschedule Purchase Orders.

訂單。買方的所有產品採購均應透過附件 C 格式的訂單進行，該附件屬本協議一部分。買方應於預計交貨日前至少三十（30）日將訂單交付給供應商。訂單應載明所訂購的產品、數量、價格、指定交貨日，以及其他相關條件提款。供應商應於收到訂單後五（5）個工作日內（週末及國定假日除外），以書面表示接受或拒絕。供應商收到訂單後未與五（5）個工作日內（週末及國定假日除外）通知買方表示接受，視為拒絕訂單。供應商接受訂單，視同再度接受本協議所規定之條件。買方訂單中附帶任何條件條款，為本協議條件條款以外的其他規定，或與本協議條件條款有所歧異，除非供應商書面同意，否則均應自動視為供應商拒絕。買方要求重新安排訂單時間，供應商應盡最大努力配合。

c) <u>Scrap Products</u>. Any Products that are found defective, broken or scrap prior to inclusion into a CBU by Buyer will be returned by Buyer to Seller, at Buyer's expense, for a full credit of the Purchase Price attributable to such Products.

廢棄產品。任何產品在買方納入整機以前發現瑕疵、破損或廢棄，將由買方退還給供應商，費用由買方承擔，該該產品的買價將全額抵免。

d) <u>Terms and Conditions</u>. The terns and conditions in this Agreement, and any Supplier-approved terms or conditions in a Purchase Order, shall constitute the exclusive contract terms between the Parties with respect to Buyer's purchase of the Products. In the event of any inconsistencies between the accepted terms and conditions in a Purchase Order and any terms in the body of this Agreement, the accepted terms contained in the Purchase Order shall govern. In the event of inconsistencies between the terms of this Agreement (or applicable Purchase Order) and any other documents submitted by Supplier, including, without limitation, any acceptance document or invoice, the terms of this Agreement (or applicable Purchase Order) shall govern. Buyer objects to any terms set forth in Suppliers acceptance documents (if any) or in Supplier's invoices that are different from or additional to the provisions of this Agreement (or applicable Purchase Order), and no such terms shall be binding upon Buyer unless Buyer specifically consents thereto in writing.

條件條款。本協議之條件條款，以及訂單中任何經供應商同意的條件條款，構成雙方之間關於買方採購產品的唯一契約條件。若訂單中所接受的條件條款，與本協議該任何本文規定之間產生任何歧異，應以訂單中已接受的條件條款為主。若本協議規定（或相關訂單）條件與供應商所提交的任何其他文件之間有歧異，包括但不限於任何確認文件或發票，應以本協議（或相關訂單）規定為主。供應商確認文件（若有）或發票中規定任何條件，與本協議（或相關訂單）規定有所歧異，或屬本協議（或相關訂單）並未規定事項，除非買方明確書面同意，否則對買方不產生拘束力。

8) <u>Intellectual Property</u>.

智慧財產權。

a) <u>Buyer Intellectual Property</u>. Buyer shall own all Intellectual Property in (i) inventions developed by Buyer whether pre-existing or developed under this Agreement; (ii) the design of any Product developed by Buyer, or developed by Supplier at Buyer's direction under this

Agreement; and (iii) inventions not previously or independently developed by Supplier or any third party that are inherent in any specifications, designs, customizations or product enhancements communicated by Buyer or developed by Supplier at the specific request of Buyer (collectively, "Buyer's Intellectual Property"). Buyer hereby grants Supplier a limited, non-exclusive, non-assignable license to use Buyer's Intellectual Property solely to manufacture and deliver Products to Buyer in strict accordance with this Agreement. Title and ownership of Buyer's Intellectual Property shall remain with Buyer at all times. Supplier shall be prohibited from using any of Buyer's Intellectual Property in any product that is not manufactured pursuant this Agreement. Upon the expiration or termination of this Agreement, Supplier shall, as directed by Buyer, return to Buyer all documents, plans specifications, drawings and other materials in any form or media, relating to Buyer's Intellectual Property, and shall retain no copy thereof. Supplier has a duty to, and hereby does, assign to Buyer any improvements and/or modifications to Buyer's Intellectual Property made by Supplier, its employees or agents, and Supplier hereby irrevocably appoints Buyer as Supplier's attorney-in-fact for the purpose of executing any and all documents and performing any and all other acts necessary to give effect and legality to such assignment. Supplier will promptly notify Buyer of the existence of any such improvements and/or modifications, and will fully cooperate in Buyer's pursuit of corresponding intellectual property protection. Supplier will take all reasonable steps to ensure that its employees and agents are bound by, and cooperate in enforcing, the provisions of this paragraph.

買方智慧財產權。關於下列各項，由買方享有所有智慧財產權：(i)買方的發明，包括既有發明，及在本協議下的發明；(ii)買方的任何產品設計，或供應商依照買方要求在本協議下所進行的產品設計；及(iii)並非供應商或任何第三方先前或獨立開發的發明，內含於買方所提供，或供應商依照買方特定要求所開發的任何規格、設計、特製或產品加強當中（合稱「買方智慧財產」）。買方茲此授與供應商一項具限制、非獨家、不可轉讓的授權，得使用買方智慧財產，但僅限於嚴格依照本協議規定之產品製造及交貨給買方。買方智慧財產的所有權，隨時均由買方保留。供應商不得就任何買方智慧財產用於非依照本協議製造的任何產品。本協議期限屆滿或終止時，供應商應依照買方的指示，將涉及買方智慧財產之所有文件、圖解、規格、圖說及其他材料，無論任何形式或載體，均返還給買方，不得保留任何副本。供應商或其員工或代理人，對買方智慧財產進行任何改良及／或修改，供應商均有責任，且茲此轉讓給買方，且就簽署任何及所有文件，及進行任何及所有行為之目的，供應商茲此不可撤銷地指定買方作為供應商的代理人，以便上述轉讓合法生效。有任何此類改良及／或修改存在時，供應商應立刻通知買方，且在買方追求相關智慧財產保護時，應充分配合。供應商將採取所有合理步驟，確保其員工及代理人均受本條規定拘束，合作執行本條款。

b)  Supplier Intellectual Property. Supplier shall own all Intellectual Property in any pre-existing inventions or other proprietary property of Supplier or any inventions Supplier develops outside the scope or independent of this Agreement (collectively, "Supplier's Intellectual Property"). Supplier hereby grants Buyer a limited, non-exclusive, non-assignable license to use, perform, distribute Supplier's Intellectual Property, or to have any of these activities performed on its behalf, but only as is necessary to market, sell and support the Products manufactured by Supplier under this Agreement. Title and ownership of Supplier's Intellectual Property shall remain with Supplier at all times. Buyer shall be prohibited from using any of Supplier's Intellectual Property in any product that is not manufactured by Supplier pursuant to this Agreement. Upon the expiration or termination of this Agreement, Buyer shall, as directed by Supplier, return to Supplier all documents, plans specifications, drawings and other materials in any form or media, relating to Supplier's Intellectual Property, and shall retain no copy thereof. Buyer has a duty to, and hereby does, assign to Supplier any improvements

and/or modifications to Supplier's Intellectual Property made by Buyer, its employees or agents, and Buyer hereby irrevocably appoints Supplier as Buyer's attorney-in-fact for the purpose of executing any and all documents and perforaning any and all other acts necessary to give effect and legality to such assignment. Buyer will promptly notify Supplier of the existence of any such improvements and/or modifications, and will fully cooperate in Supplier's pursuit of corresponding intellectual property protection. Buyer will take all reasonable steps to ensure that its employees and agents are bound by, and cooperate in enforcing, the provisions of this paragraph.

供應商智慧財產權。任何既有發明，或供應商其他專屬財產，或由供應商所開發，超越本協議範圍或獨立於本協議的任何發明，均由供應商享有智慧財產（合稱「供應商智慧財產」）。供應商茲此授與買方一項具限制、非獨家、不可轉讓的授權，得使用、執行、傳布供應商智慧財產，或由他人代表供應商進行任何此類行為，但僅限於行銷、銷售及支援供應商依照本協議所製造之產品所需。供應商智慧財產的所有權，隨時均由供應商保留。買方不得將任何供應商智慧財產用於非由供應商依照本協議製造的任何產品。本協議期屆滿或終止時，買方應依照供應商的指示，將涉及供應商智慧財產之所有文件、圖解、規格、圖說及其他材料，無論任何形式或載體，均返還給供應商，不得保留任何副本。買方或其員工或代理人，對供應商智慧財產進行任何改良及／或修改，買方均有責任，且茲此轉讓給供應商，買且簽署任何及所有文件，及進行任何此類行為之目的，買方茲此不可撤銷地指定供應商作為買方的代理人，以便上述轉讓合法生效。有任何此類改良及／或修改存在時，買方應立刻通知供應商，且在供應商追求相關智慧財產保護時，應充分配合。買方將採取所有合理步驟，確保其員工及代理人均受本條規定拘束，合作執行本條款。

c) <u>Joint Intellectual Property</u>. Except as set forth above, the parties will decide on a case-by-case basis their respective rights with regard to the Intellectual Property inherent in any inventions that are jointly developed by the parties. In the event the parties are unable to agree on their respective rights with regard to any such inventions, the parties shall jointly own such inventions with no obligation of accounting. Supplier shall provide to Buyer, and maintain current, an itemized list of all trade names, trademarks, licenses, and other Intellectual Property or proprietary rights relating to the Product.

共有智慧財產。除上述規定外，關於雙方共同開發之任何發明中內含的智慧財產，雙方將依照個案決定各自的權利。若雙方無法就關於任何此類發明的各自權利達成共識，雙方應共有該項發明，無義務結算。供應商應提供買方，並隨時更新一份與產品相關所有商名、商標、授權及其他智慧財產或專屬權利之最新清單。

d) <u>Buyer Restrictions</u>. Buyer will not at any time: (i) challenge Supplier's rights, title or interest in the Supplier's Intellectual Property; (ii) do, cause to be done, or omit to do anything that would in any way impair the rights of Supplier in Supplier's Intellectual Property; or (iii) represent to any third party that Buyer has any ownership or rights with respect to Supplier's Intellectual Property other than any specific rights granted to Buyer herein.

買方限制。買方不得：(i)質疑供應商對供應商智慧財產之權利、所有權或權益；(ii)有任何行為、促使其他人有任何行為，或疏忽進行任何行為，有損供應商對供應商智慧財產之權利；或(iii)對任何第三方表示，買方對供應商智慧財產具有任何所有權，或本協議賦予買方任何特定權利以外的其他權利。

e) <u>Supplier Restrictions</u>. Supplier will not at any time: (i) challenge Buyer's rights, title or interest in the Buyer's Intellectual Property; (ii) do, cause to be done, or omit to do anything that would in any way impair the rights of Buyer in Buyer's Intellectual Property; or (iii)

represent to any third party that Supplier has any ownership or rights with respect to Buyer's
Intellectual Property other than any specific rights granted to Supplier herein.

供應商限制。供應商不得：(i)質疑買方對買方智慧財產之權利、所有權或權益；(ii)有任
何行為、促使其他人有任何行為，或疏不進行任何行為，有損買方對買方智慧財產之權
利；或(iii)對任何第三方表示，供應商對買方智慧財產具有任何所有權，或本協議賦予
供應商任何特定權利以外的其他權利。

f)  <u>Notice of Infringement</u>. Each Party will notify the other Party promptly in writing of any
actual or potential infringements or imitations by others of either Party's Intellectual Property
in any jurisdiction(s) which come to either Party's attention during the Term of this
Agreement.

侵權通知。任一方在本協議期間內發現，他方的智慧財產權在任何國家受到任何實際或
潛在的侵害或限制，將立刻以書面告知他方。

g)  <u>Termination of Use</u>. Each Party acknowledges the other Party's proprietary rights in and to
their respective Intellectual Property and each Party hereby waives in favor of the other Party
all rights to any Intellectual Property now or hereafter originated or licensed by the other Party,
Each Party agrees that they shall not duplicate, adopt, use or register any words, phrases,
symbols, designs, technology or anything else that is identical to or confusingly similar to any
of the other Party's Intellectual Property. Upon termination of this Agreement, each Party shall
cease and desist from use of the other Party's Intellectual Property in any manner.

停止使用。各方承認他方就該方智慧財產的專屬權利，且放棄對屬於他方之任何智慧財
產的所有權利，包括目前或將來源自他方，或由他方授與之所有權利。各方同意不複製、
採用、使用或註冊與他方任何智慧財產相同，或相類似易混淆的任何文字、用語、表彰、
設計、技術或其他事物。本協議終止後，各方應停止以任何方式使用他方的智慧財產。

h)  <u>Violation</u>. Except as specifically set forth in this <u>Section 8</u>, nothing in this Agreement grants to
either Party any rights to any Intellectual Property owned by or licensed to the other Party.
Any violation of this <u>Section 8</u> shall be deemed a material violation of this Agreement and the
violated Party shall have the right to immediately terminate this Agreement and seek monetary
and equitable damages.

違反。除此第8條明確規定外，對於他方所擁有或授與之任何智慧財產，本協議並未賦
予任一方任何權利。對此第8條規定的任何違反，應視為對本協議的重大違約，受違約
方有權立刻終止本協議，要求金錢及衡平損害賠償。

9)  <u>Representations</u>.

聲明。

a)  <u>Representations</u>. Supplier represents and warrants to the Buyer that (i) all Products will be
sold to Buyer, free and clear of all liens, charges, encumbrances, or other restrictions; (ii) the
Products will be free from defects in manufacture, material and workmanship, and will be fit
and safe for the use(s) normally and reasonably intended; (iii) the Products are of
merchantable quality and are manufactured and will perform in conformance with
Specifications and Supplier samples; (iv) the Products and all materials provided to Buyer
under this Agreement are new products and do not contain anything used, refurbished or
reconditioned; (v) the Products will not violate or infringe any Intellectual Property of any
third party or any other right of any third party; (vi) Supplier is ISO 9002 certified, or certified
by similarly recognized standards; and (vii) the Products are not produced, manufactured,
assembled or packaged by the use of forced labor, prison labor or forced or illegal child labor

and that the Products were not trans-shipped for the purpose of mislabeling, evading quota or country of origin restrictions or for the purpose of avoiding compliance with forced labor, prison labor or child labor laws.

聲明。供應商向買方聲明保證下列各項：(i)銷售給買方的所有產品，均無任何留置權、質權、負擔或其他限制；(ii)產品無製造、材料或作工瑕疵，適合依照正常合理方法安全使用；(iii)產品具備可出售品質，其製造及功效符合規格及供應商樣本；(iv)依照本協議提供給買方的產品及所有材料均屬新品，不包含任何二手、翻新或修復品；(v)產品不違反或侵害任何第三方的任何智慧財產，或任何第三方的任何其他權利；(vi)供應商經ISO9002或類似公認標準認證；且(vii)產品之生產、製造、組裝或包裝，均未使用強制性勞工、禁錮勞工、強迫性或非法童工，且產品並未經過為不當標籤、逃避定額或來源國限制之目的而轉運，或為規避遵守強制性勞工、禁錮勞工、強迫性或非法童工之目的而轉運。

b) <u>Compliance With Laws.</u> Supplier represents and warrants that all Products will be manufactured, processed, packaged, labeled, tagged, tested, certified, accurately marked, weighed, inspected, shipped, sold, repaired and serviced in compliance with all applicable industry standards and all applicable federal, state, provincial and local laws, treaties and regulations.

法律遵守。供應商聲明且保證，所有產品之製造、加工、包裝、標籤、標示、測試、認證、正確註明、秤重、檢測、運輸、銷售、修理及維護，均符合所有相關行業標準，以及所有相關聯邦、州立、省立及地方法律、公約及規定。

c) <u>Third Party Intellectual Property Rights.</u> Supplier represents and warrants that it has secured, and maintains in good standing, all third party Intellectual Property licenses that are required for Buyer's promotion, marketing, distribution and sale of the Products, or consumer electronics incorporating the Products. Upon written request from Buyer, Supplier shall promptly (i) identify the existence of any third party Intellectual Property licenses applicable to or required by the Products or consumer electronics incorporating the Products ("<u>Applicable IP Agreements</u>"); (ii) provide evidence to Buyer that Supplier has executed all Applicable IP Agreements and has paid all royalties under Applicable IP Agreements for Products supplied by Supplier, including, at Buyer's discretion, either copies of royalty reports and payment information showing that the royalties have been paid or written confirmation from licensors that royalties have been paid on Products sold to Buyer. Supplier will maintain proper books and records so as to allow the verification of amounts paid or owed to licensors in accordance with the Applicable IP Agreements. If the use or sale of any Product, or consumer electronics incorporating any Product, by Buyer or any of its affiliates or customers is enjoined, at Buyer's request and option, and without prejudice to Buyer's other rights and remedies, Supplier will, at its cost and expense (x) procure all appropriate licenses to permit Buyer and its affiliates and customers to continue to use and sell such Products; or (y) modify the allegedly infringing Product to avoid the infringement in a manner reasonably acceptable to Buyer. In order to avoid Third Party Intellectual Property infringement claims, Buyer shall not assemble, manufacture, market, or sell Products, or consumer electronics containing Products, utilizing technology, processes, features, or other intellectual property which Supplier has not approved.

第三方智慧財產權。供應商聲明且保證，已經取得並將保持所有第三方智慧財產授權，以便買方可以促銷、行銷、分銷及銷售產品，或包含產品的消費者電子產品。經買方書面要求，供應商應立刻(i)說明產品或包含產品的消費者電子產品中，包含或需要哪些第三方智慧財產授權（「相關智慧財產協議」）；(ii)提供證據給買方，顯示關於供應商所提

供的產品，供應商已簽署所有相關智慧財產協議，並已支付相關智慧財產協議所規定之所有權利金，包括依照買方的要求，提供權利金報告及支付資訊影本，證明已經支付權利金，或授權人所出具的書面確認函，表示關於出售給買方的產品已經支付權利金。供應商應保持適當的帳冊紀錄，以便核對依照相關智慧財產協議，已經支付或應支付給授權人的金額。若買方或任何關係企業或客戶對任何產品（或包含任何產品的消費者電子產品）的使用或銷售受到禁止，經買方要求及選擇，供應商應自費採取下列行動，不影響買方的其他權利及救濟：(x)取得所有適當授權，以便買方及其關係企業與客戶得以繼續使用及銷售該項產品；或(y)以買方合理可接受的方式修改受指稱侵權的產品，避免侵權。為避免第三方智慧財產侵權主張，買方不得組裝、製造、行銷或銷售產品，或包含產品之消費者電子產品時，不得使用供應商尚未核准之技術、流程、特性或其他智慧財產。

d) <u>Notification</u>. Each Party will promptly notify the other Party upon learning of any apparent breach of the provisions contained in this <u>Section 9</u>, and the parties shall thereafter discuss a procedure to be followed to minimize any loss therefrom. Buyer's sampling of Product or approving Product for shipment will neither relieve Supplier from the warranties contained herein nor be a waiver of any rights arising hereunder.

通知。任一方發現任何明顯違反此<u>第 9 條</u>規定之情事，應立刻通知他方，由雙方討論將任何損失降到最低的程序。買方提供產品樣本，或核准產品出貨，均不因此解除供應商在本協議下之擔保，亦不構成對本協議所規定任何權利之放棄。

10) <u>Product Warranty, Recall and Returns.</u>
產品擔保、召回及退貨。

a) <u>Warranty</u>.
擔保。

i) For a twelve (12) month period commencing on April 1, 2014, as a short term solution to the current return problem, and in lieu of any warranty obligation for the Products, Supplier shall have shipped all Element-branded returned products (that Supplier has the right to manufacture and sell pursuant to that certain Trademark License Agreement dated as of December 9, 2013) from its customers to the Factory and Buyer shall own all right and title to such returned product at no additional cost.

自 2014 年 4 月 1 日起十二（12）個月期間內，作為目前退貨問題的短期解決方法，並取代任何產品擔保義務，供應商應將所退回的所有 Element 品牌產品（供應商依照 2013 年 12 月 9 日商標授權協議有權製造銷售的產品）自客戶處運送至工廠，買方對此等退回產品擁有所有權利及所有權，無需付款。

ii) Commencing on April 1, 2015 and thereafter, Section 10(a)(i) shall be null and void and in its place, Supplier shall provide Buyer with a 1.5% Product allowance with every Purchase Order in lieu of any warranty obligation, or the Parties may mutually agree to another warranty solution.

自 2015 年 4 月 1 日開始，第 10(a)(i)條規定停止適用，關於每個訂單，供應商應提供買方 1.5%的產品抵扣，取代任何擔保義務。雙方亦得約定其他擔保解決方案。

iii) On or after April 1, 2014, Buyer shall be responsible to provide a customer support call center for all Element-branded products.

自 2014 年 4 月 1 日開始，關於所有 Element 品牌產品，買方應負責提供客戶支援

電話中心。

b) <u>Returns</u>. Unless otherwise set forth in a Purchase Order, Buyer will have the right to return any Products (i) that are not manufactured, packaged or labeled in accordance with the Specifications, industry standards and/or all applicable laws, ordinances, rules and regulations; (ii) that are shipped in error or in non-conformance with the applicable Purchase Order or Specifications; or (iii) that are. damaged or defective, in Buyer's sole discretion, consistent with the advertised end- user warranty period.

<u>退貨</u>。除非訂單另有規定，買方有權退還下列任何產品：(i)製造、包裝或標籤不符合規格、行業標準及所有相關法律、法典、規定及規則；(ii)供貨錯誤或不符合相關訂單或規格；或(iii)毀損或瑕疵，在遵守所聲明的終端用戶擔保期間內，由買方自行判斷。

c) <u>Remedies</u>. Without limiting any other rights available to Buyer, including, without limitation, Buyer's right to indemnification hereunder, in the event any Products shall not conform to the representations or warranties contained in this Agreement, or are returned by Buyer, Supplier shall, at Buyer's option, either (i) replace them without cost to Buyer, or (ii) credit or refund Buyer the Purchase Price for such Products and Buyer may offset any such amounts against amounts Buyer owes Supplier. In addition. Supplier shall pay Buyer all other charges paid by Buyer in connection with such nonconforming Products.

<u>救濟</u>。任何產品不符合本協議所規定的聲明或擔保，或由買方退還，供應商應依照買方的選擇：(i)更換產品，不得向買方收費，或(ii)將產品買價作抵扣或退還給買方，買方可以用來扣減買方應支付給供應商的任何金額，不影響買方的任何其他權利，包括但不限於買方依照本協議要求賠償的權利。此外，供應商應支付買方關於不合規產品所支付的所有其他費用。

11) <u>Performance</u>. At all times during the term of this Agreement, Supplier shall maintain the necessary facilities capable of fulfilling all Purchase Orders from Buyer for timely delivery of the Product and otherwise fulfilling all obligations of Supplier under this Agreement. Supplier will keep Buyer advised, on a commercially reasonable basis, of the status of all outstanding and undelivered Purchase Orders. Supplier shall promptly notify Buyer if Supplier shall not be able to comply with any provision hereunder or under any term of a Purchase Order.

<u>執行</u>。在本協議期間內，供應商應隨時保持所需設施，得以滿足買方的所有訂單，準時交付產品，並履行供應商在本協議下的所有其他義務。關於所有尚未執行及尚未送貨的訂單，供應商應按商業合理基礎告知買方。供應商無法遵守本協議任何規定，或任何訂單規定，應立刻告知買方。

12) <u>Confidentiality</u>.

保密。

a) <u>Definition</u>, The term "<u>Confidential Information</u>" as used in this Agreement means any information or compilation of information that is proprietary to either Party and relates to the disclosing Party's existing or reasonably foreseeable business, Including, without limitation, trade secrets and information relating to the Products, marketing strategies, product development anddesign, Specifications, pricing, costs, financing methods, financial information, Intellectual Property, manufacturing processes, all customer information and any other information about the disclosing Party's business that is normally considered confidential or which is indicated in writing by the disclosing Party to be confidential or trade secret. Confidential Information shall not include any information that (i) is part of the public domain at the time of disclosure or becomes part of the public domain through no fault of the

receiving party; (ii) was already in the receiving Party's possession, as evidenced by written documentation, prior to the disclosure of such information to the receiving Party by the disclosing Party; or (iii) is subsequently disclosed to the receiving Party on a non-confidential basis by a third party who is not under any obligation of confidentiality relating to such disclosed information.

定義。本協議所謂「機密資訊」，指專屬於任一方所有，涉及披露方的現有或合理可預測業務之任何資訊或資訊彙整，包括但不限於貿易機密及關於產品的資訊、行銷策略、產品開發及設計、規格、定價、成本、融資方法、財務資訊、智慧財產、製造流程、所有客戶資訊，以及關於披露方業務，通常認為屬於機密，或由披露方書面表示屬於機密或貿易機密的任何其它資訊。機密資訊不包含下列任何資訊：(i)披露當時屬於公開領域，或非因收受方過錯，後來成為公開領域的資訊；(ii)有書面文件證明，在披露方向收受方披露以前，已經為收受方持有的資訊；(iii)後續由第三方向收受方以非機密基礎披露的資訊，且此第三方對於所披露的資訊沒有保密義務。

b) <u>Nondisclosure</u>. During the term of this Agreement and at all times thereafter, the receiving Party shall hold in the strictest of confidence and to never disclose, transfer, convey, make assessable to any person or use in any way Confidential Information of the disclosing Party for the receiving Party's own or another's benefit or permit the same to be used in competition with the disclosing Party, unless expressly agreed to in writing by the disclosing Party.

禁止披露。在本協議期間內，及本協議結束後，收受方均應嚴格保密，不得為自己或其他人的利益，披露、移轉、轉移、允許任何人以任何方式接觸或使用披露方的機密資訊，或允許機密資訊用於與披露方競爭，但披露方明確書面同意不在此限。

c) <u>Protective Action.</u> The receiving Party shall protect the Confidential Information of the disclosing Party from unauthorized use or disclosure by using the same degree of care as the receiving Party uses to protect its own confidential information of a like nature, but no less than a reasonable degree of care. The receiving Party will take reasonable precautions to prevent its employees, representatives, agents and others from disclosing or appropriating for their own use any of the Confidential Information of the disclosing Party.

保護行為。收受方應保護披露方的機密資訊，免於未經授權的使用或披露。注意程度應相當於收受方用來保護自己類似性質機密資訊相同的程度，但不得低於合理注意程度。收受方將採取合理防範措施，避免員工、代表人、代理人或其他人披露或侵佔使用披露方的任何機密資訊。

d) <u>Injunctive Relief</u>. In addition to any other relief afforded by law, the Parties shall have the right to enforce covenants contained in this <u>Section 12</u> by specific performance and preliminary, temporary and permanent injunctive relief against a recipient of such Party's Confidential Information. Each Party agrees that the other Party shall be entitled to an injunction without the posting of any bond, enjoining or restraining any recipient from any violation or violations of the confidentiality provisions of this <u>Section 12</u>. Damages, specific performance and injunctive relief shall be considered proper modes of relief and are not to be considered alternative remedies.

禁制救濟。除法律所規定的任何其他救濟外，雙方有權執行此第12條所規定的承諾，對於收到該方機密資訊的對象，要求特定履行，以及初步、暫時性及永久性的禁制救濟。各方同意，他方有權要求禁制救濟，無需提供任何擔保，禁止或限制任何資訊收受第12條的保密規定。損害賠償、特定履行及禁制救濟，均屬適當的救濟方式，不屬於他種救濟。

13) <u>Indemnification</u>.
   賠償。

   a) <u>By Supplier</u>. Supplier hereby agrees to be responsible for, to defend and indemnify Buyer and
   to hold its directors, officers, employees, shareholders, agents, affiliates, successors and
   assigns, harmless from any and all liabilities, claims, demands, causes of action or damages
   (including, without limitation, reasonable attorney's fees and settlement amounts) relating to
   or arising out of (i) any breach of representation, warranty, covenant or agreement on the part
   of Supplier under this Agreement; (ii) acts or omissions of Supplier relating to the
   manufacturing, materials or workmanship of Products which includes, but is not limited to
   claims that the Products, or use thereof, caused personal injury, death, or real or personal
   property damage; (iii) a Product recall as a result of manufacturing, materials or workmanship,
   whether or not initiated by Supplier; (iv) any actual or alleged infringement of any Intellectual
   Property or other right relating to any Product, or other breach of this Agreement; or (v) the
   negligence or willful misconduct of Supplier; provided, however, that in no event shall
   Supplier be liable for matters for which Buyer is responsible under <u>Section 13(b)</u> or for any
   Specification provided by Buyer.
   <u>供應商賠償</u>。供應商茲此負責、抗辯、賠償賣方，並保證買方的董事、經理人、員工、
   股東、代理人、關係企業、繼承人及繼受人，均免於關於(i)供應商違反本協議所規定的
   任何聲明、擔保、承諾或約定；(ii)供應商關於產品製造、材料或作工的行為或疏失，包
   括但不限於產品或產品使用導致人身傷害、死亡、不動產或不動產損害等申訴；(iii)因
   製造、材料或作工，由供應商或其他人召回產品，(iv)關於任何產品有任何智慧財產或
   其他權利的任何實際或聲稱侵害，或對本協議有其他違反情事；或(v)供應商的過失或故
   意不當行為，或因上述各項而產生之任何及所有責任、主張、要求、訴因或損害（包括
   但不限於合理律師費及和解金額），但買方依照<u>第 13(b)條</u>規定應負責的事項，或由買方
   所提供之任何規格，供應商均不負責任。

   b) <u>By Buyer</u>. Buyer hereby agrees to be responsible for, to defend and indemnify .Supplier and to
   hold its directors, officers, employees, shareholders, agents, affiliates, successors and assigns,
   harmless from any and all liabilities, claims, demands, causes of action or damages (including,
   without limitation, reasonable attorney's fees and settlement amounts) relating to or arising
   out of (i) any breach of representation, warranty, covenant or agreement on the part of Buyer
   under this Agreement; or (ii) acts or omissions of Buyer relating to the conversion of Products
   into CBUs, which includes, but is not limited to claims that the CBU, or use thereof, caused
   personal injury, death, or real or personal property damage; (iii) a CBU recall as a result of the
   conversion of Products into CBUs, whether or not initiated by Buyer; (iv) any actual or
   alleged infringement of any Intellectual Property or other right relating to any CBU, or other
   breach of this Agreement; or (v) the negligence or willful misconduct of Buyer; provided that
   in no event shall Buyer be liable for matters for which Supplier is responsible under <u>Section
   13(a)</u>.
   <u>買方賠償</u>。買方茲此負責、抗辯、賠償供應商，並保證供應商的董事、經理人、員工、
   股東、代理人、關係企業、繼承人及繼受人，均免於關於(i)買方違反本協議所規定的任
   何聲明、擔保、承諾或約定；(ii)買方關於將產品轉為整機產品的行為或疏失，包括但
   不限於整機或整機的使用導致人身傷害、死亡、不動產或不動產損害等申訴；(iii)因產品
   轉為整機產品的結果，導致由買方或其他人召回整機產品，(iv)關於任何整機產品有任何
   智慧財產或其他權利的任何實際或聲稱侵害，或對本協議有其他違反情事；或(v)買方
   的過失或故意不當行為，或因上述各項而產生之任何及所有責任、主張、要求、訴因或
   損害（包括但不限於合理律師費及和解金額），但供應商依照<u>第 13(a)條</u>規定應負責的事

項，買方均不負責任。

c) <u>Third Party Claims</u>. If a claim by a third party is made against an indemnified party and if the indemnified party intends to seek indemnity with respect thereto under this <u>Section 13</u>, such indemnified party shall promptly notify the indemnifying party of such claim; provided, however, that failure to give timely notice shall not affect the rights of the indemnified party so long as the failure to give timely notice does not adversely affect the indemnifying party's ability to defend such claim against a third party. The indemnifying party shall be entitled to assume the defense thereof, with counsel selected by the indemnifying party and reasonably satisfactory to the indemnified party. The indemnifying party shall have control of the defense of any such action, including any appeals and negotiations for the settlement or compromise thereof and shall have full authority to enter into a binding settlement or compromise; provided that, the indemnifying party shall not enter into any settlement or compromise which may adversely affect the indemnified party without the indemnified party's consent, which consent shall not be unreasonably withheld.   If the indemnifying party assumes the defense of such claim, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof. The indemnified party may participate, at its own cost and expense, in the defense of any such claim; provided that such defense shall be controlled by the indemnifying party.

第三方申訴。若第三方對受賠償方提出申訴，且受賠償方計畫依照第13條規定要求賠償，則受賠償方應立刻告知賠償方有申訴產生，但雖未及時發出通知，如果未及時通知並未對受賠償方對第三方抗辯的能力產生不當影響，仍不因此影響受賠償方的權利。賠償方有權接管抗辯，聘用由賠償方所選擇，經受賠償方合理接受的律師。賠償方應掌控任何此類訴訟的抗辯，包括任何上訴及和解或妥協協商，且有充分的權限，可簽署具拘束力的和解或妥協書，但未經受賠償方同意，賠償方不得簽署對受賠償方有負面影響的任何和解或妥協書。受賠償方無正當理由不得拒絕同意。若賠償方接管上述申訴的抗辯，賠償方對受賠償方後續關於抗辯所產生的任何法律或其他費用，均不再負責。受賠償方得自費參與任何此類訴訟的抗辯，但此項抗辯應由賠償方所掌控。

d) <u>Cooperation as to Indemnified Liability.</u> Each Party hereto shall cooperate fully with the other Party with respect to access to books, records, or other documentation within such Party's control, if deemed reasonably necessary or appropriate by any Party in the defense of any claim which may give rise to indemnification hereunder.

受賠償方的合作。關於各方所掌控範圍內的帳冊、紀錄或其他文件，在依照本協議規定產生賠償責任的任何申訴中，任一方合理認為需要或適當者，各方均應與他方充分合作。

14) <u>Insurance</u>
保險

a) Throughout the term of this Agreement and thereafter upon prior annual written request by either party, for each of the five (5) years following the date of expiration or termination of this Agreement, each party, at their sole cost and expense, shall obtain and maintain, or be covered through its parent, the following insurance policies from a recognized insurance company qualified to do business in the United States of America or such other jurisdictions as either party may from time to time request:

在本協議期間內，以及本協議期限屆滿或終止後五（5）年期間內每一年，經任一方提前一年書面要求，各方應自費取得，或透過自身的母公司，獲得並維持由在美國（或任

一方不時所要求其他國家）具業務資格之著名保險公司所核發的下列保險保單：

i) Comprehensive General Liability (including product, shipping loss, fire, theft, and completed operations), with a minimum of $5,000,000 general aggregate limit; $5,000,000 products and completed operations aggregate limit; and $2,000,000 each occurrence, written on an occurrence form; and
綜合責任保險（包括產品、運送損失、火災、偷竊及完工責任），一般累計限額不低於$5,000,000；產品及完工責任累計限額$5,000,000；及每次事件$2,000,000,使用事故發生基礎承保式。

ii) Product Liability insurance, providing protection in the following amount of coverage: $5,000,000 combined single limit against any claims, demands, or causes of action or damages, including reasonable attorney's fees, arising out of any alleged defects in such articles, or any sale, distribution or use thereof.
產品責任保險，提供下列金額的保障：關於物品或物品之銷售、分銷或使用主張瑕疵，所產生之任何申訴、要求或訴因或損害，包括合理律師費，合併單一限額$5,000,000。

b) Annually, upon each renewal (or at other appropriate intervals), each party will supply the other party with a Certificate of Insurance with respect to each of the foregoing policies that names such party, its subsidiaries, parent, affiliates and licensors as Additional Insureds, and which also provides that such insurance will not be canceled or changed unless at least thirty (30) days prior written notice has been given to such party. Coverage and limits referred to above shall not in any way limit the liability of either party and may be required to be increased to stay current with industry standards.
關於上述每項保單，於每年續約時（或其他適當間隔期間），各方將提供他方保險證書，將該方及其子公司、母公司、關係企業及授權方列為共同被保險人，並規定，此等保險取消或變更，必須先提前至少三十（30）日書面通知該方。上述規定之保險範圍及限額，並不形成對任一方責任的限制，同時可能為了符合行業標準而必須提高。

15) <u>Term</u>. This Agreement will take effect on the date first written above and will continue in full force and effect for an initial period of one (1) year (the "<u>Initial Term</u>"). Upon expiration of the Initial Term, this Agreement will automatically extend and renew for successive one year terms (each a "<u>Renewal Term</u>" and, collectively, the "<u>Renewal Terms</u>"), unless either party gives notice of its election to not renew this Agreement at the end of the Initial Term or any Renewal Term, as applicable, upon 180 days prior written notice to the other party. The Initial Term and each applicable Renewal Term will collectively be defined as the "<u>Term</u>."
<u>期間</u>。本協議於首頁所載日期生效，初步有效期間為一（1）年（「<u>初始期間</u>」）。初始期間結束後，除非任一方提前180日書面通知他方，表示在初始期間或任何續約期間結束後不續約，否則本協議將自動續約，每次一年（每次為一個「<u>續約期間</u>」，合稱為「<u>續約期間</u>」）。初始期間及每個續約期間，以下合稱為「<u>期間</u>」。

16) <u>Termination</u>. In addition to the foregoing, this Agreement may be terminated in any manner provided below:
<u>終止</u>。除上述規定外，本協議得依照下列規定之任何方式終止：

a) <u>Breach of Agreement</u>. Either party may either terminate this Agreement in its entirety by written notice if the other party is in material breach of this Agreement and fails to cure the breach within 30 days of receipt of first written notice of the breach, or if it is not reasonably

possible to cure such breach within such 30 day time period, then the breach shall be cured within the shortest possible reasonable time to cure, whichin no event shall be longer than 90 days.

違約。任一方遇他方重大違反本協議，且未能在收到首次書面違約通知後30日內糾正（若欠缺在30日期間內糾正違約的合理可能性，則應於最短可能的合理期間內糾正，最長不得超過90日）時，得發出書面通知完全終止本協議。

b) <u>Other Termination Events</u>. Buyer or Supplier (as appropriate) may immediately terminate this Agreement in its entirety upon the following events:

其他終止情事。發生下列情事時，買方或供應商得立刻完全終止本協議：

i) Any change in the ownership of Supplier that materially affects Buyer; or

供應商所有權變更，對買方形成重大影響；或

ii) Buyer or Supplier is not in compliance with all applicable federal, state, provincial and local laws, treaties and regulations relating to the operation of its business.

買方或供應商未遵守與其業務經營相關之所有聯邦、州立、省立及地方法律、公約及規定。

17) <u>Rights and Obligations Upon Termination</u>. Upon termination of this Agreement, the following provisions shall apply:

終止後的權利義務：本協議終止後，適用下列規定：

a) <u>Return of Confidential Information</u>. Upon termination of this Agreement, each Party shall, within 10 days after the effective date of such termination, return to the other Party all copies of materials and documents or copies thereof containing any Confidential Information of the other Party.

返還機密資訊。本協議終止後，各方應於終止生效日起10日內，將包含他方任何機密資訊之所有材料及文件或影本返還給他方。

b) <u>Open Purchase Orders</u>. Upon termination of this Agreement, all Purchase Orders submitted by Buyer and accepted by Supplier will remain in effect and be delivered upon by Supplier in accordance with their terms and this Agreement. Buyer shall pay for all Products shipped by Supplier pursuant to confirmed Purchase Orders in accordance with the terms contained in this Agreement.

尚未結束的訂單。本協議終止時，買方已提交，且供應商已接受的所有訂單，將繼續有效，供應商應依照訂單及本協議規定交貨。供應商依照已確認訂單，依照本協議條件出貨的全部產品，買方均應付款。

c) <u>Existing Accounts Receivable</u>. Buyer shall pay when due any invoices issued by Supplier for Products manufactured and shipped prior to the effective date of expiration or termination of this Agreement in accordance with the terms and conditions of this Agreement. Supplier shall pay Buyer, upon demand, any credit balance.

現有應收帳款。關於本協議結束日或終止日以前，依照本協議條件條款製造交付的產品，買方應依照供應商所發出的發票付款。供應商應依照要求向買方支付任何抵扣餘額。

d) <u>Reservation of Rights and Remedies</u>. Any Party who terminates this Agreement in accordance with the terms of this Agreement shall also have all other rights and remedies available under law or equity for any claim it may have against the other Party whether for breach of contract

or otherwise.

保留權利及救濟。任一方依照本協議規定終止本協議，關於對他方的違約或其他主張，亦將享有法律或衡平原則所規定之所有其他權利及救濟。

e) <u>Surviving Obligations</u>. Each Party's rights, and obligations under the provisions of each section that, by their nature, should survive the termination of this Agreement, including, without limitation, Sections 8, 12, and 19, shall survive any termination of this Agreement and continue in full force and effect.

繼續存續的義務。各方在每個條款下的權利及義務，在性質上於本協議終止後應繼續存在，包括但不限於第 8、12 及 19 條，則應於本協議終止後繼續存續有效，。

18) <u>Notices</u>. Unless otherwise directed in writing by a Party, all notices, demands, waivers, requests, consents and other communications under this Agreement shall be in writing and shall be deemed to have been delivered on the date personally delivered or on the date deposited in the United States Postal Service, postage prepaid, by certified mail, return receipt requested, delivered by Federal Express overnight delivery, or delivered by electronic facsimile and confirmed:

通知。除非一方另有書面指示，本協議下的所有通知、要求、棄權、請求、同意及其他通訊，均應以書面為之，並於當面送達之日，或以預付郵資附回執的美國郵政掛號郵件投郵之日，或聯邦快遞隔夜服務送達之日，或傳真確認之日，視為已經送達：

*If to Supplier:*
若通知對象為供應商：

*If to Buyer:*
若通知對象為買方：

TONGFANG GLOBAL LIMITED
9F, Sector D of Tong Fang Information Harbor,
Lang Shan Rd., Hi-tech Industrial Park (North)
Nan Shan District, Shenzhen China
Tel: +86-755-3301 0849
Fax: +86-755-3301 0002
同方國際有限公司
中國深圳市南山區高新技術產業園北區朗山
路同方信息港 D 棟 9 樓
電話：+86-755-3301 0849
傳真：+86-755-3301 0002

Element TV Company, LP
10909 Valley View Road
Eden Prairie, Minnesota 55344
Telephone: (612) 669-7708
Element TV Company, LP
10909 Valley View Road
Eden Prairie, Minnesota 55344
電話：(612) 669-7708

Element Television Company, LLC
10909 Valley View Road
Eden Prairie, Minnesota 55344
Telephone: (612) 669-7708
Element Television Company, LLC
10909 Valley View Road
Eden Prairie, Minnesota 55344
電話：(612) 669-7708

19) <u>General Provisions.</u>
一般條款。

a. <u>Controlling Law.</u> This Agreement shall be interpreted and governed by the laws of the State of Delaware, USA, without application of its conflict of law provisions. The Uniform Commercial Code as it is enacted in the state of Delaware shall govern this Agreement, Any action brought under this Agreement must be venued in either the jurisdiction of the courts of

the Hong Kong Special Administrative Region of the People's Republic of China or in any state in the United States of America, with the choice of such venue made by the Plaintiff. The parties hereby submit to the jurisdiction as selected pursuant to this provision.

準據法。本協議應依照美國達拉威爾州法律解釋，受該法律規範，不適用其衝突法規定。達拉威爾州頒布的統一商典適用於本協議。依照本協議的任何訴訟，應向中華人民共和國香港特別行政區法院，或美國任何州的法院提出，地點由原告決定。雙方茲此接受依照本條規定所選擇的管轄區。

b.  <u>No Offset</u>. Neither party's obligation to make payments under this Agreement may be offset by the other party's obligations to make payments under other agreements.

不抵扣。任一方依照本協議規定的付款義務，均不得與他方依照其他協議的付款義務相抵扣。

c.  <u>Severability</u>. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

可分割性。若本協議任何條款受具管轄權的法院認定無效、失效或不可執行，其餘條款仍應充分有效，不受任何影響、削減或失效。

d.  <u>Existence and Authority</u>. Buyer and Supplier each hereby represent and warrant that (i) such Party is validly incorporated or organized under the laws of the jurisdiction of its incorporation or organization, is validly existing and authorized to do business in the jurisdictions where such Party currently does business; (ii) such Party has full power and authority to enter into and deliver this Agreement and to perform its obligations hereunder; (iii) such Party has duly authorized the person executing this Agreement on behalf of such Party to do such; and (iv) this Agreement constitutes the legal, valid and binding obligations of each Party hereto, enforceable against it in accordance with its terms.

存續及權限。買方及供應商各自聲明且保證：(i)各方依照所設立或組織所屬國家的法律有效設立或組織，有效存續，且具備在該方目前經營業務所在國家經營業務的權限；(ii)各方有充分的權力及權限，可以簽署交付本協議，履行本協議下的義務；(iii)各方由適當授權人代表該方簽署本協議；且(iv)本協議構成各方合法、有效且具拘束力的義務，可依照本協議規定向各方執行。

e.  <u>Government Authorization</u>. No notification, authorization, consent or approval of, or notice to, or filing or registration with, any governmental authority is required to be obtained or given, and no waiting period is required to expire, in connection with each Party's execution and delivery of this Agreement and the performance of its obligations hereunder.

政府授權。關於各方簽署交付本協議，履行本協議下的義務，不需要取得或獲得任何政府機關的通知、授權、同意或核准，或向任何機關提出告知、申請或註冊，且並無任何尚未結束的等候期間。

f.  <u>Entire Agreement</u>. This Agreement contains the entire contract between the Parties as to the subject matter hereof and supersedes any prior or contemporaneous written or oral agreements between the Parties with respect to the subject matter hereof.

完整合意。本協議包含雙方之間關於所規定事項的完整合意，取代雙方之間關於所規定事項，任何先前或同時的書面或口頭協議。

g.  <u>Modifications and Waivers</u>. No purported amendment, modification or waiver of any

provision of this Agreement shall be binding unless set forth in a written document signed by all Parties (in the case of amendments and modifications) or by the Party to be charged thereby (in the case of waivers). Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term or provision of this Agreement or of the same circumstance or event upon any recurrence thereof. Any failure by any Party to detect, protest, or remedy any breach of this Agreement shall not constitute a waiver or impairment of any such term or condition, or the right of such Party at any time to avail itself of such remedies as it may have for any breach or breaches of such term or condition.

修改及棄權。對本協議任何條款有任何修改、變更或放棄，必須由各方（若屬修改及變更）由負擔義務的一方（若屬棄權）簽署一份書面文件，否則無拘束力。任何棄權均僅限於書面棄權文件中所列之特定情況或事件，不得視為對本協議任何其他規定或條款之放棄，或對相同情況或事件發生時的棄權。任一方未察覺、反對或糾正本協議任何為約，並不構成對任何此等條件條款之棄權或削減，亦不放棄或削減該方針對此等條件條款之違約執行救濟的權利。

h. <u>Further Assurances.</u> From time to time, at the request of any Party hereto and at the expense of the Party so requesting, each Party shall execute and deliver to the requesting Party such documents and take such other action as such requesting party may reasonably request in order to consummate more effectively the transactions contemplated hereby.

其他確保。經任一方要求，各方應簽署提供文件，進行合理要求的行為，以便更有效率地完成本協議所規定的交易，費用由提出要求的一方承擔。

i. <u>Assignment/Binding Nature.</u> Neither Party may delegate any of its duties or assign any of its rights under this Agreement to any third party unless the other Party has specifically consented to such delegation or assignment in writing. This Agreement shall be binding upon each Party's successors and assigns and upon each Party's successors and permitted assigns approved by the other Party as provided above.

轉讓／拘束性質。任一方均不得將本協議下的任何責任委託，或將任何權利轉讓給任何第三方，但他方特別書面同意此類委託或轉讓時不在此限。本協議對各方的繼承人及經依照上述規定經他方書面核准之受讓人，均具有拘束力。

j. <u>No Partnership：Joint Venture: Agency.</u> This Agreement does not constitute and shall not be construed as constituting a partnership under applicable state law nor a joint venture agreement among the Parties. No Party shall have any right to obligate or bind another Party in any manner whatsoever as a result of this Agreement, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons. Neither Buyer on one hand nor Supplier on the other are intended to be nor shall be considered an agent for the other.

無合夥；合資；代理。本協議不構成，且不得解釋為構成相關州法下雙方的合夥或合資協議。任一方均無權透過本協議，以任何方式形成他方的義務或拘束，且本協議任何規定均不賦予任何此類第三方的權利。買方及供應商均非他方的代理人。

k. <u>Force Majeure.</u> Neither Party shall be in default by reason of any failure in performance of this Agreement if such failure arises, directly or indirectly, out of causes reasonably beyond the direct control of or foreseeable by such Party, including, but not limited to, acts of God or of the public enemy, U.S. or foreign governmental acts in either a sovereign or contractual capacity, fire, wind, flood, accident, epidemic, restrictions, strikes or freight embargoes or because of any law, order, proclamation, regulation or ordinance of any governmental

authority or any other unforeseeable act or action of like character.

不可抗力。任一方直接或間接因超出該方合理控制或預期範圍的原因包括但不限於天災或公敵，美國或外國政府的主權或契約行為，火災，風災，水災，意外，傳染病，限制，罷工或禁運，或因任何政府機關的任何法律、命令、聲明、規定或法條變更，或任何其他無法預測之類似性質行為或行動，導致未能履行本協議時，不屬該方過錯。

l. <u>Construction.</u>   Should any provision of this Agreement require judicial interpretation, the Parties agree that the forum interpreting or construing the same shall not apply a presumption that this Agreement shall be more strictly construed against one Party than another.

解釋。若本協議任何條款需要司法解釋，雙方同意，解釋機關不得假設本協議的解釋應對其中一方較為嚴格。

m. <u>English Language Controls.</u> This Agreement and all related Purchase Orders and other documents shall be construed and interpreted in the English language. If this Agreement exists in another language, the English version of this Agreement shall be the official version and shall control. All monetary amounts referenced herein shall be in United States dollars.

英文版本為主。本協議及所有相關訂單，以及其他文件，均應以英文解釋。若本協議有其他語言的版本，本協議英文版本應為正式版本，以英文版本為主。本協議所列之所有金額，均為美元。

n. <u>Counterparts; Facsimile.</u> This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and each of which alone and all of which together, shall constitute one and the same instrument, but in making proof of this Agreement it shall not be necessary to produce or account for each copy of any counterpart other than the counterpart signed by the Party against whom this Agreement is to be enforced. This Agreement may be transmitted by facsimile, and it is the intent of the Parties for the facsimile (or a photocopy thereof) of any autograph printed by a receiving facsimile machine to be an original signature and for the facsimile (or a photocopy thereof) and any complete photocopy of the Agreement to be deemed an original counterpart.

文本：傳真。本協議可簽署數份文本，每份均視為正本。每份文本單獨或共同形成單一且相同的文件，但在證明本協議時，無需提供每份文本，僅需提出作為執行本協議對象的一方簽署過的文本。本協議得傳真。雙方接受傳真（或傳真影本）簽名作為簽名正本，本協議的傳真（或傳真影本）及任何完整影本作為正本。

(Signature page immediately follows.)
（後附簽名頁）

IN WITNESS WHEREOF, the parties hereto have caused this Supply Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

恐口說無憑，各方已由各自適當授權經理人，於首頁所載日期適當簽署交付本供應協議。

*Buyer:*
買方：

*Supplier:*
供應商：

ELEMENT TV COMPANY, LP
*By its General Partner*
ELEMENT TELEVISION COMPANY, LLC
ELEMENT TV COMPANY, LP

TONGFANG GLOBAL LIMITED
同方國際有限公司

*由一般責任合夥人代表*
ELEMENT TELEVISION COMPANY, LLC

_____          _____
Michael L. O'Shaughnessy, President       By: Matthew Chan
總經理 Michael L. O'Shaughnessy            Its: Deputy General Manager
                                          簽署人：Matthew Chan
                                          職稱：副總經理

*Buyer:*
*買方：*

ELEMENT TELEVISION COMPANY, LLC
ELEMENT TELEVISION COMPANY, LLC

_____
Michael L. O'Shaughnessy, President
總經理 Michael L. O'Shaughnessy

_____

<u>EXHIBIT A TO SUPPLY AGREEMENT</u>
*Products and Specifications*

<u>供應協議附件 A</u>
*產品及規格*

**EXHIBIT B TO SUPPLY AGREEMENT**
*Escrow Agreement*

**供應協議附件 B**
*監管協議*

## EXHIBIT C TO SUPPLY AGREEMENT
*Purchase Order Specimen*

## 供應協議附件 C
*訂單範本*

## EXHIBIT D TO SUPPLY AGREEMENT
*Buyer's Customers and Terms*

### 供應協議附件 D
*買方的客戶及條件*

**EXHIBIT E TO SUPPLY AGREEMENT**
*Incoming Inspection Standards*

**供應協議附件 E**
*進貨檢驗標準*